[No. 57846-0. En Banc. March 12, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES WILLIAM POST, *Petitioner*.

598

*Carney, Stephenson, Badley, Smith & Spellman, P.S.,* by *James E. Lobsenz* and *John P. Griffin,* for petitioner.

*Norm Maleng, Prosecuting Attorney, Donna L. Wise, Senior Appellate Attorney,* and *Jonathan M. Love, Deputy,* for respondent.

UTTER, J. — This case arises from the sentence Charles William Post received for first degree rape and burglary convictions in 1988. He received a sentence exceeding the standard range under the Sentencing Reform Act of 1981 (SRA), RCW 9.94A. Post's future dangerousness was one of the grounds for his exceptional sentence. As evidence of Post's future dangerousness, the trial court considered Post's prior rape convictions and the results of a 1980 interview that Post had with a Department of Corrections psychologist. Post claims the use of this information and the testimony at the sentencing hearing violated his Fifth Amendment right against compelled self-incrimination and

the psychologist-patient privilege of RCW 18.83.110. We conclude that the trial court properly considered the 1980 report and the psychologist's testimony as evidence of Post's future dangerousness and affirm the sentence.

## FACTS

On October 10, 1988, Charles Post was convicted of first degree rape and burglary. *See State v. Post*, 59 Wn. App. 389, 797 P.2d 1160 (1990), *review granted*, 116 Wn.2d 1018 (1991). The trial court imposed an exceptional sentence of 180 months (15 years)[1] and listed four reasons as justification: (1) deliberate cruelty, (2) violation of the victim's zone of privacy, (3) future dangerousness, and (4) protection of the public.

The convictions arose from events that occurred on February 20, 1988. On that morning, shortly before 8 a.m., 15-year-old M awoke and was confronted in her bedroom at her parents' home by Charles Post. Post tried to choke M and then raped her. When he left the residence, he took a camera and camera bag that belonged to M's sister. Post was on parole for two prior first degree rape convictions when he committed the 1988 rape and burglary. Post did not testify at his trial.

The sentencing hearing was held on November 9, 1988. Post filed a notice to dispute material facts. The State presented testimony from Dr. Brett Trowbridge, a psychologist, and Thomas Porro, Post's community corrections officer. The judge had a copy of the presentence report prepared by Thomas Porro. He also had a copy of a report that Dr. Trowbridge prepared after interviewing Post in September 1980. Post objected to the use of both men's testimony

---

[1]Post's standard range for his first degree burglary is 31 to 41 months; for his first degree rape it is 72 to 96 months. This range was calculated with an offender score of 3 for the burglary and 4 for the rape. Post's prior offenses include two counts of first degree rape and one count of second degree escape. In 1974, Post pleaded guilty to two counts of first degree rape apparently in exchange for dismissal of two other rape counts. In all four rapes, Post displayed a knife and raped a woman unknown to him. In three of the four cases, Post also robbed the victim. In 1981, Post was convicted of an escape from work release.

and their reports to support the State's recommendation that an exceptional sentence be imposed. Post's objection against Dr. Trowbridge's testimony was based 'on the Fifth Amendment privilege against self-incrimination and the psychologist-patient privilege.

The objection against Porro's testimony was based on the appearance of fairness doctrine. Post had filed a civil suit against Porro and the Department of Corrections (hereafter DOC) prior to the preparation of the presentence report. In that suit Post alleged that his parole was terminated for his failure to submit to a lie detector test.

Dr. Trowbridge gave the court his current opinion that Post was "predatory" and had a high likelihood of reoffending if released into the community. He did not believe Post's chances for successful treatment were good. Trowbridge's opinion was based on the 1980 interview and Post's conduct since 1980. Post's refusal to admit his guilt in committing the most recent offense was a factor in Trowbridge's opinion because "[p]eople who deny their pattern of sexual deviancy are almost impossible to treat". Report of Proceedings, at 22 (sentencing hearing).

Dr. Trowbridge was a consultant to DOC in 1980. He interviewed Post in September 1980 after Post's parole officer referred Post to Trowbridge. Post had been transferred to work release in August 1980 and his parole officer was concerned about his progress. The purpose of this interview was to evaluate Post and give a recommendation to DOC work release personnel as to Post's potential dangerousness; what Post's problems might be; how quickly he could leave work release; and his suitability for work release. Trowbridge conducted no psychological tests on Post. The interview was limited to the subject of Post's prior crimes.

Dr. Trowbridge concluded in the 1980 report that Post was potentially dangerous, recommending "close scrutiny and monitoring", noting that Post had not appreciably changed after 6 years in prison. In his report, Trowbridge concluded that Post was manipulative and showed little

insight into his sexual deviancy. Post denied any sexual motivation in the rapes he committed in 1974 and contended that the rapes were motivated by money.

During the interview Dr. Trowbridge told Post that the report would not be confidential. He routinely told individuals that his reports became part of their permanent Department of Corrections file. In testimony at the sentencing hearing, Trowbridge acknowledged that he did not anticipate that his report would be used 8 years later in a sentencing hearing and did not warn Post about such a possibility. Trowbridge also acknowledged that Post was "required" to submit to his evaluation in the sense that it was widely known that if individuals did not cooperate during the interview process, it was a factor considered against them: "There were people who refused to see me and were sent back to the institutions . . .." Report of Proceedings, at 25 (sentencing hearing). He did not advise Post of his *Miranda* rights before conducting the 1980 interview.

Thomas Porro concurred in the State's recommendation of a 30-year exceptional sentence. Porro based his conclusion on Post's current and prior offenses and his institutional record. Porro also believed that Post was likely to reoffend.

The Court of Appeals found no grounds for a new trial and affirmed the sentence. *State v. Post*, 59 Wn. App. 389, 396, 406, 797 P.2d 1160 (1990), *review granted*, 116 Wn.2d 1018 (1991). It invalidated the deliberate cruelty and zone of privacy factors supporting the exceptional sentence. *Post*, 59 Wn. App. at 398-402. The Court of Appeals then ruled that Post's statements to Dr. Trowbridge were not protected by the psychologist-patient privilege. *Post*, at 404. It held that Trowbridge's testimony and 1980 report should not have been considered at the sentencing hearing because Post had not been given *Miranda* warnings prior to the 1980 interview. *Post*, at 405. While the Court of Appeals ruled that the sentencing judge's consideration of Dr. Trowbridge's testimony and 1980 report violated Post's Fifth Amendment privilege against self-incrimination, it held

that Post's criminal history alone supported the future dangerousness finding.

Post filed a motion for reconsideration on October 25, 1990. This court's decision in *State v. Pryor*, 115 Wn.2d 445, 799 P.2d 244 (1990) was released the same day. On November 7, 1990, the Court of Appeals denied Post's motion for reconsideration.

Post now asks that his exceptional sentence be vacated in light of *State v. Pryor, supra,* and that we remand for resentencing. Post also claims that the appearance of fairness doctrine bars the trial court from considering the presentence report written by Thomas Porro. Finally, Post seeks a new trial. We address these claims each in turn.

I

EXCEPTIONAL SENTENCE

The main issue presented in this claim is whether at sentencing the trial court was able to consider Dr. Trowbridge's opinion and testimony regarding Post's amenability to treatment. Post argues that the Fifth Amendment and the psychologist-patient privilege bar the use of this information for sentencing purposes. The State, while conceding the Fifth Amendment applies to a sentencing hearing where the State seeks an exceptional sentence,[2] counters that the trial court properly considered Dr. Trowbridge's opinion and testimony regarding Post's lack of amenability to treatment. We begin with the Fifth Amendment question.

■ The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself". *Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964). The availability of the Fifth Amendment privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites. *In re Gault*, 387 U.S. 1, 49, 18 L. Ed. 2d

---

[2]This point was conceded at oral argument.

527, 87 S. Ct. 1428 (1967). Thus, in the past this court has said that it does not allow statements made by a convicted defendant to a probation officer or psychiatrist revealing prior criminal but unconvicted behavior to influence the sentencing decision. *State v. Ammons*, 105 Wn.2d 175, 184, 713 P.2d 719, 718 P.2d 796, *cert. denied*, 479 U.S. 930 (1986). It is no less important that constitutional guaranties be observed at the sentencing phase than at the investigative and trial phases of a criminal prosecution.

## A

■ Did the use of Post's 1980 statements to Dr. Trowbridge as grounds for an exceptional sentence violate Post's Fifth Amendment rights? The general rule is that if a person desires not to incriminate himself or herself, he or she must invoke the protection of the Fifth Amendment privilege against self-incrimination rather than answer. *Garner v. United States*, 424 U.S. 648, 654 n.9, 47 L. Ed. 2d 370, 96 S. Ct. 1178 (1976); *State v. Sargent*, 111 Wn.2d 641, 648, 762 P.2d 1127 (1988). Post did not assert his Fifth Amendment right during the course of his interview with Dr. Trowbridge. In only two situations will the failure to claim the privilege be excused: custodial interrogation by a state agent, and situations where the assertion of the privilege is penalized. The first exception is based on *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). The second exception is expressed in *Minnesota v. Murphy*, 465 U.S. 420, 429-30, 435-36, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984). The requirements of neither exception are satisfied and we reverse the Court of Appeals holding that Post's Fifth Amendment rights were violated. For the reasons outlined below, we reject the Court of Appeals' *Miranda* analysis.

■■ The *Miranda* exception applies when the interview or examination is (1) custodial (2) interrogation (3) by a state agent. *State v. Sargent*, 111 Wn.2d 641, 649-53, 762 P.2d 1127 (1988). In most cases, "custodial" refers to whether the defendant's freedom of movement was restricted at the time

of questioning. *Sargent,* at 649-50. "Interrogation" occurs when the probation officer should have known that his questioning would have provoked an incriminating response. *Sargent,* at 650-52. Also, under *Sargent,* any questioning not necessary to prepare the presentence report amounts to interrogation. *Sargent,* at 651. The parties do not dispute that Dr. Trowbridge was a state agent when he interviewed Post in September 1980.

The Court of Appeals assumed that a person serving a prison sentence is automatically in custody for *Miranda* purposes. We do not agree. "Custody" for *Miranda* purposes is narrowly circumscribed and requires " ' "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " *Minnesota v. Murphy, supra* at 430 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983) (per curiam) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977) (per curiam))).

The record does not indicate that Post was in "custody" in the sense meant by *Miranda* when the 1980 interview took place. The record does not indicate the location of the 1980 interview, but it does show that Post had work release status beginning sometime in August 1980. A person on work release is in the custody of the DOC in the sense that one is not truly free to come and go as one desires until his or her sentence expires. However, the restrictions on a convicted felon's freedom of movement while on work release do not equal the restraints on freedom of movement that accompany formal arrest.

■ The traditional "custody" analysis of *Miranda* is not appropriate when the interview or questioning may have occurred in a prison setting or the person being questioned is serving a criminal sentence. All convicted felons serving their sentence are in "custody" because their freedom of movement is "restricted" until they have served their sentence. When the person being interviewed is serving a prison sentence, it is appropriate to analogize to the cases applying *Miranda* to questioning of prisoners in prison. *See*

*United States v. Conley,* 779 F.2d 970, 973 (4th Cir. 1985), *cert. denied,* 479 U.S. 830 (1986); *Cervantes v. Walker,* 589 F.2d 424, 427-29 (9th Cir. 1978). These cases note that traditional *Miranda* "custody" analysis leads to the anomalous result of requiring *Miranda* warnings anytime a prison official desires to speak with an inmate. Instead, these cases consider the circumstances and setting of the interview to see if the inmate was subjected to more than the usual restraint to depart. In particular, they look for some act which places further limitations on the prisoner's already limited freedom of movement. *See Cervantes,* at 428.

Applying this test, we note that Post does not suggest that he was physically restrained from leaving the interview area or bound during the interview. *See Conley* (questioning of handcuffed inmate awaiting medical treatment after being involved in a prison fight did not require *Miranda* warnings). He was on work release and the psychological pressure to stay and answer questions in order to preserve that status suggests some degree of psychological "restraint" motivated him to attend or prevented him from breaking off the interview.

■ A defendant's assertion of psychological compulsion alone is not enough to support a finding that the defendant was in custody for *Miranda* purposes. The defendant must show some objective facts indicating his or her freedom of movement was restricted. In the context of determining custody in nonprison settings, we have said that the inquiry into freedom of movement is an objective one; the psychological state of the person being questioned is irrelevant to determining if his freedom of movement was restricted. *See State v. Sargent, supra* at 649. Under this analysis, we find that Post was not in "custody" for *Miranda* purposes.

■ The Court of Appeals found that interrogation had occurred because it felt that

[s]ince the purpose of the interview was to glean information from Post to determine his fitness for institutional adjustment, it is reasonable to expect that some of the questions were likely to elicit incriminating responses.

*Post,* at 405. We cannot agree. Trowbridge did not put any questions to Post that were unnecessary for him to complete his evaluation. Trowbridge did not ask about any other acts for which Post could face new criminal liability. Thus, it cannot be said that Trowbridge confronted Post with any evidence of his guilt for new crimes that were being investigated, *see Cervantes,* or that Trowbridge was seeking evidence for acts for which Post could face new criminal liability. The questions were restricted to Post's past acts so that Trowbridge could form an opinion whether Post was able to control his behavior without close supervision in a less restrictive environment. The use of the examination for enhancing Post's sentence "in a later prosecution for crimes not yet (and, one would hope, not ever) committed was wholly unforseen [*sic*]." *State v. Allen,* 68 Or. App. 5, 10, 680 P.2d 997, 999, *review denied,* 297 Or. 547 (1984). The key difference between *Sargent* and this case is that Post had no criminal prosecution or appeal pending in September 1980. This fact makes this case more similar to *Allen,* and thus no "interrogation" occurred for *Miranda* purposes.

Post argues that *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981) requires us to hold that his statements to Trowbridge are inadmissible at his sentencing hearing because Trowbridge did not administer *Miranda* warnings before the interview. *See Estelle v. Smith, supra. Estelle* and its progeny are distinguishable from the present case. *Estelle* was a death penalty case in which the State had a specific and substantial evidentiary burden to meet in the penalty phase trial: proof of future dangerousness beyond a reasonable doubt. No requirement of bifurcated proceedings or a similar evidentiary burden is imposed on a prosecutor who seeks an exceptional sentence under the SRA. Also, the defendant in *Estelle* was ordered by the trial judge to undergo his competency examination. The critical difference between *Estelle* and the case at hand is that the trial judge did not order Post to undergo any sort of psy-

chiatric examination.[3] Without such official compulsion, the predicate for extending *Miranda*-like procedures to protect the Fifth Amendment right is not present in this case. *See People v. Wright*, 431 Mich. 282, 293-94, 430 N.W.2d 133, 138 (1988).

■ The United States Supreme Court has said that *Miranda* warnings were intended "[t]o dissipate 'the overbearing compulsion . . . caused by isolation of a suspect in police custody,'". *Minnesota v. Murphy*, 465 U.S. 420, 429-30, 435-36, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984) (citing *United States v. Washington*, 431 U.S. 181, 187 n.5, 52 L. Ed. 2d 238, 97 S. Ct. 1814 (1977)). *Miranda* was intended to address a range of problems that occur during the investigatory phase of a criminal prosecution. On the basis of the facts in this case, we are not convinced that abuses occurred during Dr. Trowbridge's interview of Post that require a new prophylactic rule. Therefore, we decline to extend the *Miranda* exception to cover the case before us.

## B

■ The "penalty" situation exception to the general rule that the Fifth Amendment privilege is not self-executing excuses a defendant's failure to assert the privilege in situations where the State threatens to sanction the exercise of the privilege. *Minnesota v. Murphy, supra* at 434-35. The rationale of this exception is that the State's threat forecloses a free choice to remain silent and compels incrimination, thus requiring that any incriminating statements

---

[3]This fact helps distinguish this case from *Pens v. Bail*, 902 F.2d 1464 (9th Cir. 1990) (per curiam). In that case, the trial judge sent a sex offender, who was to be sentenced under the old indeterminate sentence system, to Western State Hospital (WSH) for testing and observation before imposing sentence. Moreover, WSH personnel made express guaranties of confidentiality to Pens. No express guaranties of confidentiality were made to Post by Dr. Trowbridge, nor was there any reasonable expectation of confidentiality. See section I(C), *infra*. Finally, it was expected that the results of Pens' interviews with and examinations by WSH staff and doctors would be used to determine the length of his sentence.

made be deemed compelled and inadmissible in a criminal prosecution. *Minnesota*, at 434-35. As we read *Minnesota v. Murphy, supra*, the "penalty" exception is available only if (1) the person gives answers that would incriminate him or her in a separate criminal proceeding and (2) the State makes express or implied assertions that exercise of the Fifth Amendment privilege will result in the imposition of a penalty, be it economic loss or deprivation of liberty.

When the penalty exception is claimed, the analysis focuses on whether a particular disclosure that is later used in a criminal prosecution is (1) incriminating, and (2) coerced by the threat of a penalty. *See United States v. Oliveras*, 905 F.2d 623, 626 n.5 (2d Cir. 1990); *Mace v. Amestoy*, 765 F. Supp. 847 (D. Vt. 1991). A defendant must establish a reasonable belief that there was the potential for incrimination. *Amestoy*, at 851. If the state desires to use the incriminating response, it has the burden of eliminating the threat of incrimination. *Amestoy*, at 851-52.

We must determine whether Post was required to make an incriminating statement or lose his work release status by remaining silent. This inquiry turns on whether Post faced a realistic threat of incrimination in a separate criminal proceeding when he made his statements to Dr. Trowbridge. *See Minnesota v. Murphy, supra* at 435 n.7.[4] We are not convinced that Post faced a realistic threat of incrimination in a separate criminal proceeding at the time he made the statements to Dr. Trowbridge. Nothing in the record indicates that, at the time of the interview with Trowbridge, Post had committed crimes which had not yet been discovered or charged. Nor did he have any criminal actions or appeals pending at the time the interview took place. Thus,

---

[4]The Court noted that a state could require a probationer to appear and discuss matters that affect his probationary status; such a requirement alone would not give rise to a self-executing privilege. *Minnesota v. Murphy, supra* at 435. However, if at the time of the interview with the probation officer the prisoner's answers would incriminate him in a separate criminal proceeding, and the state expressly or implicitly asserted that claiming the privilege would lead to revocation of parole, then the penalty exception will apply and any answers would be deemed compelled. *See Minnesota*, at 435.

it cannot be said that Post faced a realistic threat of incrimination when he made his statements to Dr. Trowbridge. Post's statements were not incriminating since Dr. Trowbridge's questions and Post's responses were confined to criminal conduct for which Post had already pleaded guilty or been convicted. *See United States v. Oliveras, supra* (a sentencing offense level reduction given for personal acceptance of responsibility for criminal conduct cannot require a defendant to accept responsibility for crimes other than those to which he has pleaded or been found guilty). Post may have felt psychological compulsion to answer Trowbridge's questions, but his answers did not expose him to new or additional criminal liability. This does not establish a reasonable belief that Post's answers would be potentially incriminating.

It was argued that the loss of a conditional liberty interest was implicitly threatened if Post remained silent or chose not to meet with Dr. Trowbridge. Post's general belief was that he would be returned to prison from work release if he did not cooperate in the interview.[5] However, there was no suggestion by the State that Post would lose his work release status if he did not incriminate himself. *See Minnesota v. Murphy, supra* at 434; *see generally* Westen, *"Freedom" and "Coercion" — Virtue Words and Vice Words*, 1985 Duke L.J. 541 (1985). When compared to the cases in which coercion was found, the alleged compulsion here is too conditional and not sufficiently immediate to qualify as coercive. We have not been presented with any statute or regulation which provides for revocation of work release status when a prisoner invokes the Fifth Amendment right or any testimony of DOC personnel that work release was terminated if a prisoner invoked the Fifth Amendment during a psychological interview. *Cf. Lefkowitz v. Cunningham,* 431 U.S. 801, 53 L. Ed. 2d 1, 97 S. Ct. 2132 (1977);

---

[5]"A: [By Dr. Trowbridge] There were people who refused to see me and were sent back to the institutions; however, I am sure they were given a message if they didn't cooperate, that would be considered a factor against them." Report of Proceedings, at 25 (sentencing hearing).

*Lefkowitz v. Turley,* 414 U.S. 78, 38 L. Ed. 2d 274, 94 S. Ct. 316 (1973) (statutes provided that invoking the Fifth Amendment or failure to answer would result in loss of office in a political party and public contracts, respectively); *Garrity v. New Jersey,* 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967) (failure to answer all questions could result in loss of employment under a forfeiture-of-office statute).

On the basis of the facts before us, we find that Post did not face a realistic threat of incrimination at the time he made his statements to Dr. Trowbridge. Also, we are not satisfied that Post would lose his work release status if he invoked the protection of the Fifth Amendment. The circumstances do not show that DOC or Dr. Trowbridge sought to prevent Post from exercising his right to remain silent.

### C

The psychologist-patient privilege issue is next raised. We hold that the trial court did not violate the psychologist-patient privilege.

RCW 18.83.110 makes the confidential communications between a client and psychologist privileged against compulsory disclosure. The privilege does not apply where it is manifest that the patient did not intend his or her communications to be confidential. *In re Henderson,* 29 Wn. App. 748, 752, 630 P.2d 944 (1981). As with all the evidentiary privileges, a person may not claim a privilege as to communications that do not originate in the confidence that they will not be disclosed. *State v. Coe,* 109 Wn.2d 832, 843, 750 P.2d 208 (1988); 8 J. Wigmore, *Evidence* § 2285 (1961).

An objective inquiry must be made when determining whether the patient intended the communications to be confidential. The patient's subjective expectations of confidence, while relevant, should not be given more weight than the objective evidence of the situation and circumstances in which the communication was made. A patient's intent that the communication be confidential must be reasonable in light of the circumstances surrounding the communication.

Applying this rule to the facts of this case, the trial court did not err by allowing Dr. Trowbridge to testify over Post's

objection. Dr. Trowbridge informed Post that the interview would not be confidential. Report of Proceedings, at 26 (sentencing hearing). The purpose of the interview was to provide a recommendation to the DOC personnel supervising Post's work release activities so that they could properly monitor his behavior. Report of Proceedings, at 12 (sentencing hearing). Given these circumstances, Post's subjective expectations of confidentiality were unreasonable.

 Post argues that a psychologist-patient relationship arose by implication from Post's subjective expectation that he might receive sexual deviancy counseling from Trowbridge directly or from another mental health professional as a result of Trowbridge's recommendation. *See State v. Sullivan*, 60 Wn.2d 214, 222-26, 373 P.2d 474 (1962). However, we do not find that such a relationship arose by implication from Post's single interview with Trowbridge. The psychiatrist barred from testifying in *Sullivan* had observed and treated the defendant continually for 60 days while she was confined to Northern State Hospital. In the precedent relied upon in *Sullivan*, the psychiatrist had conducted five interviews with the defendant. *See Taylor v. United States*, 222 F.2d 398 (D.C. Cir. 1955).[6]

It is unrealistic to believe that a psychologist-patient relationship can arise by implication from a single interview conducted under the conditions described above, especially when the doctor or mental health professional disavows any confidentiality as to the matters discussed. Post's communications to Dr. Trowbridge did not originate in the confidence that they would not be disclosed, and no psychologist-patient relationship arose between Post and Dr. Trowbridge.

---

[6] We note in passing that labeling Dr. Trowbridge's interview with Post "forensic" is improper. Black's Law Dictionary defines "forensic" as "[b]elonging to the courts of justice." As Trowbridge admitted, he did not expect that the results of his interview with Post would be used in a sentencing proceeding. Thus, it cannot be said that he conducted a forensic examination of Post. Moreover, attempts to characterize Post's interview with Dr. Trowbridge as either "forensic" or designed to provide "treatment" do not help determine whether the communication arose with the intention that it would not be disclosed.

Without an underlying relationship for the privilege to protect, there is no rationale for extending the privilege.

## D

Having determined that the trial court could properly consider Dr. Trowbridge's testimony and the contents of his 1980 report at Post's sentencing hearing, we now review Post's exceptional sentence. An exceptional sentence is subject to appellate review under RCW 9.94A.210(4), which provides:

> To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.210(4). Subsection (4)(b) was not briefed by either party and thus is not at issue. *State v. Estrella*, 115 Wn.2d 350, 355, 798 P.2d 289 (1990). Subsection (a) of RCW 9.94A.210(4) provides two grounds for appellate review of exceptional sentences. *See Estrella*, at 355, 357.

The first subsection (4)(a) inquiry is whether the reasons for imposing the exceptional sentence are supported by the record. This is a factual inquiry and the "clearly erroneous" standard of review applies. *Estrella*, at 355. The second subsection (4)(a) inquiry is whether the sentencing judge's reasons justify imposition of a sentence outside the presumptive range. This question is a matter of law, where the reviewing court "weigh[s] the reasons given against the purposes of the [SRA] and determine[s] whether the former are consistent with the latter." (Footnote omitted.) *Estrella*, at 357 (quoting D. Boerner, *Sentencing in Washington* § 9.32, at 9-71 (1985)); RCW 9.94A.120(2).

### Future Dangerousness

Future dangerousness is a nonstatutory aggravating factor that may justify the imposition of an exceptional sentence on a sex offender. *State v. Barnes*, 117 Wn.2d 701, 818

P.2d 1088 (1991); *State v. Pryor*, 115 Wn.2d 445, 799 P.2d 244 (1990) (conviction for indecent liberties). Under *Pryor*, the trial court may impose an exceptional sentence on a sex offender on the basis of his or her future dangerousness where (1) the defendant has a history of similar criminal conduct and, where the crime is a sexual offense, (2) the defendant is not amenable to treatment, as established by the opinion of a mental health professional. *State v. DeMara*, 62 Wn. App. 23, 29, 812 P.2d 898 (1991) (citing *State v. Pryor, supra*).

Post's criminal record establishes that he has a history of rape convictions. In 1974 he pleaded guilty to two counts of first degree rape. The trial court made this a finding of fact. See finding of fact 1.2.

The record also establishes that Post is not amenable to treatment. See finding of fact 1.4. This finding is supported by Dr. Trowbridge's testimony at the sentencing hearing:

> I think he is a person who has a very compulsive offensive history. Treatment could possibly benefit him but, frankly, I feel chances of successful treatment . . . would be very likely unsuccessful . . ..

Report of Proceedings, at 23 (sentencing hearing). It was also Trowbridge's opinion that Post was "predatory" and was likely to reoffend when he returned to the community. Post's actions subsequent to the 1980 interview clearly demonstrate the ineffectiveness of "doing time" to cure Post's sexual deviancy. We conclude that the trial court had sufficient evidence before it to support its conclusion that Post posed a threat of future danger to the community.

### Protection of the Public

Post contends that the fourth aggravating factor, protection of the public, was an inappropriate reason for imposing his exceptional sentence. He argues that protection of the public cannot simultaneously be both a purpose of the SRA and an aggravating factor justifying imposition of an exceptional sentence. This question is a matter of law.

The SRA lists a set of nonexclusive aggravating and mitigating factors to be considered when imposing an exceptional sentence. RCW 9.94A.390; *Estrella*, at 357. Protection of the public is one of the purposes of the SRA. RCW 9.94A.010. It is not contained in the nonexclusive list of aggravating and mitigating factors, and no decision of this court has held that it is an appropriate aggravating factor.

Where the future dangerousness finding is supported by the evidence, protection of the public does not refer to any distinct set of concerns not already encompassed by the future dangerousness factor. However, protection of the public is the very rationale of the future dangerousness factor. *See State v. Strauss*, 54 Wn. App. 408, 422-23, 773 P.2d 898 (1989). Permitting protection of the public to be an aggravating factor in cases where future dangerousness is shown creates the illusion that protection of the public has its own content apart from future dangerousness when in reality they express the same concerns. We conclude as a matter of law that protection of the public cannot be used as an aggravating factor where future dangerousness is established.

We must next decide if a remand for resentencing is necessary. *State v. Pryor, supra* at 456.

> Generally, [a remand to the trial court for resentencing] is necessary when the trial court places significant weight on an inappropriate factor, or where some factors are inappropriate and the exceptional sentence significantly deviates from the standard range.

*Pryor*, at 456; *see also State v. Dunaway*, 109 Wn.2d 207, 219-20, 743 P.2d 1237, 749 P.2d 160 (1987) (remand appropriate where only one of three reasons were valid and the sentence was 20 years above the midpoint of the standard range). Remand is not required when the reviewing court is confident that the trial judge would impose the same sentence even when he or she considered only the valid reasons. *State v. Pryor, supra*.

Here, the trial court placed great weight on its finding that Post was "predatory" and "compulsive" and would

likely reoffend when reintroduced into the community. See findings of fact 1.2, 1.3. The chief reason for the exceptional sentence was that the standard range did not provide an adequate measure of safety to the community from someone who reoffends so quickly after being released from jail. Finding of fact 1.5. The sentence here did not exceed the statutory maximum. Moreover, our review is limited by defendant's failure to raise and brief the issue whether the sentence was "clearly excessive". RCW 9.94A.210(4)(b); *cf. State v. Dunaway, supra.* Since we find no Fifth Amendment violation, we do not consider defendant's claim that the *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1987) standard of review for constitutional error[7] applies to appellate review of exceptional sentences. The sentence of the trial court is affirmed. Since the future dangerousness finding in this case is sufficient to uphold the exceptional sentence, it is unnecessary to review the Court of Appeals' decisions regarding the deliberate cruelty and zone of privacy aggravating factors.[8]

## II
### APPEARANCE OF FAIRNESS

Post has filed a civil rights suit against Community Corrections Officer Thomas Porro and the DOC for terminating his parole for failure to submit to a lie detector test. Post claims that this lawsuit has biased Porro against him. Post asks us to extend the appearance of fairness doctrine to encompass the community correction officer who prepares a presentencing report. Post argues that the presentence investigator is an agent of the judiciary whose bias must be imputed to the judge. We decline to extend the appearance of fairness doctrine this far.

---

[7]*See State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986). We do not endorse the Court of Appeals' reasoning on this issue or decide whether this standard of review applies to appellate review of exceptional sentences.

[8]The Court of Appeals invalidated the deliberate cruelty and zone of privacy aggravating factors. *See* 59 Wn. App. at 398-402.

██ ██ The judge is the ultimate decisionmaker at a sentencing hearing. *See* RCW 9.94A.120 ("When a person is convicted of a felony, the *court* shall impose punishment . . ."). (Italics ours.) The role of the probation officer is to investigate the prior criminal record of the defendant. *See* RCW 9.94A.110 ("The court shall order the department [of corrections] to complete a presentence report before imposing a sentence . . ."); *see also United States v. Belgard*, 894 F.2d 1092, 1098 (9th Cir.) (identifying the investigatory role of the probation officer under the federal sentencing guidelines), *cert. denied*, 111 S. Ct. 164 (1990). Post's argument equates the role of the probation officer with the role of the judge. While there is some merit to the idea that the presentence report writer is a person upon whom the sentencing judge depends for neutral information, *see Belgard*, Post's argument blurs the functional distinction between the judge and the writer of the presentence report.

This distinction is an important one. Our previous decisions involving the appearance of fairness doctrine have focused on the actual and apparent bias of a judge or other quasi-judicial decisionmaker. *See, e.g., Hoquiam v. Public Empl. Relations Comm'n*, 97 Wn.2d 481, 488, 646 P.2d 129 (1982) and the cases cited therein. "The law goes farther than requiring an impartial judge; it also requires that the judge appear to be impartial." *State v. Madry*, 8 Wn. App. 61, 70, 504 P.2d 1156 (1972). The probation officer is not the decisionmaker at the sentencing hearing and is not subject to the appearance of fairness doctrine. Therefore, we hold that the appearance of fairness doctrine will not disqualify an allegedly biased writer of a presentence report. As the Court of Appeals noted, the bias affects the weight of his testimony and report.

Similarly, we reject Post's argument that the procedures used to prepare his presentence report violate the appearance of fairness doctrine. Post objects to the DOC allowing Thomas Porro to prepare the presentence report after Post had filed a civil lawsuit against Porro. If the doctrine were to apply here, a debatable proposition, the appearance of

fairness doctrine is directed at the evil of a biased or potentially interested judge or quasi-judicial decisionmaker. *See Hoquiam v. Public Empl. Relations Comm'n, supra.*[9] Post has not shown how the judge at his sentencing hearing was biased. Without evidence of actual or potential bias, an appearance of fairness claim cannot succeed and is without merit. Because Post's appearance of fairness claim does not contain evidence of actual or potential bias of the judge toward him, Post's appearance of fairness claim is without merit.

## III
### NEW TRIAL

Post claims that a single remark of a witness so prejudiced him in the eyes of the jury that a new trial is required. We disagree.

While a detective was being questioned whether or not the investigation had ever focused or narrowed on Post, he responded to the State's question, "How is it you became aware of Mr. Post?" as follows: "We became aware of Mr. Post from a telephone information call from an individual who gave us his name." Report of Proceedings vol. III, at 357. After a prompt sidebar, the judge instructed the jury to disregard the detective's answer. Post argues this comment violated his right to confront witnesses against him and, as an expression of the caller's opinion that Post was the rapist, his right to a jury trial. During a recess, Post moved for a mistrial on the grounds that the caller's opinion as to Post's guilt was hearsay and that, since the case against Post was one of circumstantial evidence, this was prejudice that could not be dispelled by the curative instruction. See Report of Proceedings vol. III, at 364-66.

---

[9]Past decisions of this court have applied the appearance of fairness doctrine when decision-making procedures have created an appearance of unfairness. *E.g., Smith v. Skagit Cy.*, 75 Wn.2d 715, 453 P.2d 832 (1969). Our decision here does not overrule this line of decisions, but reformulates the threshold that must be met before the doctrine will be applied: evidence of a judge's or decisionmaker's actual or potential bias. This enhanced threshold requirement is more closely related to the evil which the doctrine is designed to prevent.

 ██ The trial court has wide discretion to cure trial irregularities, *State v. Gilcrist*, 91 Wn.2d 603, 612, 590 P.2d 809 (1979), and the standard of review is an abuse of discretion, *State v. Weber*, 99 Wn.2d 158, 166, 659 P.2d 1102 (1983). In considering whether a trial irregularity warrants a new trial, the court must consider (1) the seriousness of the irregularity; (2) whether the statement was cumulative of evidence properly admitted; and (3) whether the irregularity could be cured by an instruction. *State v. Escalona*, 49 Wn. App. 251, 254, 742 P.2d 190 (1987). The appropriate inquiry is whether the testimony, when viewed against the backdrop of all the evidence, so tainted the trial that Post did not receive a fair trial. *Weber*, at 164.

The comment was improper. While there was no formal motion in limine on the subject of other suspects, the parties understood that the court would not permit the State to introduce how the police came to suspect Post. Report of Proceedings vol. I, at 22. In this case the jury had other evidence before it that identified Post as the rapist. Hair samples taken from the scene were microscopically similar to Post's hair. Report of Proceedings vol. III, at 445-46. Semen found in the victim's vagina and underpants was consistent with blood and saliva samples taken from Post. Report of Proceedings vol. IV, at 453-63. A neighbor identified Post as the man he saw leave the victim's residence the morning of the rape while carrying a gray camera bag. Report of Proceedings vol. I, at 117-20. The reference to the caller's opinion that Post was the rapist was very attenuated. The detective never testified that the caller had said that Post had committed the rape. Moreover, the judge promptly instructed the jury to disregard the response rather than letting the objected-to statement dwell in the minds of the jury. This single reference was not so prejudicial that nothing short of a new trial could cure the error. *See State v. Mak*, 105 Wn.2d 692, 701, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). The trial court did not abuse its discretion in denying Post's motion for a new trial.

Post argues that *State v. Miles*, 73 Wn.2d 67, 436 P.2d 198 (1968) conflicts with the Court of Appeals decision in this case. *Miles* rests on different facts than the case at hand. In *Miles*, a police officer testified that the police's attention was drawn to the defendant from a police teletype that described two suspects in a particular car headed for Spokane from Grandview in order to commit a robbery. This court, focusing on the prejudicial effect to the defendant arising from the disclosure of another uncharged serious offense at his trial on a different charge, ordered a new trial. There was no reference to other uncharged offenses at Post's trial, and thus *Miles* does not compel us to grant Post a new trial.

The use of statements that Post made to Dr. Trowbridge in 1980 as evidence of Post's future dangerousness when being sentenced for crimes committed in 1988 did not violate the Fifth Amendment or psychologist-patient privilege of RCW 18.83.110. Since the evidence before the trial court adequately supports its future dangerousness finding, the sentence of the trial court is affirmed.

DORE, C.J., and BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

After modification, further reconsideration denied September 10, 1992.