FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2013 APR 22 AM 9: 38

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | |
| | ) | No. 67109-0-I |
| v. | ) | |
| | ) | |
| JAMES LEROY SLY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: April 22, 2013 |

DWYER, J. – A trial irregularity warrants a mistrial only if the resulting prejudice is severe enough to deny the defendant a fair trial. In this prosecution for first degree child molestation, the complaining witness's references to the defendant's prior acts of sexual abuse were too vague and attenuated to cause significant prejudice. The trial court therefore did not abuse its discretion by denying James Sly's motion for a mistrial. We affirm.

I

In about 1998, eight-year old L.L.S. and her younger sister, L.R.S., moved into a Des Moines foster home run by Sandra Sly and Curtis Adams Sr.

Sandra's[1] son, James Sly, also lived in the home, along with Curtis's children, Jamel Adams and Curtis Adams Jr. Within two years, Sandra adopted both L.L.S. and L.R.S. The family later lived in West Seattle and Federal Way.

In December 2007, L.L.S. told the Federal Way police and Child Protective Services caseworkers that Sandra had physically abused her for many years. L.L.S. also disclosed that James, Jamel, and Curtis Jr., had repeatedly raped her.

The State charged James with one count of first degree child molestation (involving L.L.S.) and one count of first degree child rape (involving L.R.S.). The State also charged Curtis Jr., with one count of first degree child rape (L.L.S.) and one count of first degree child molestation (L.R.S.). Prior to trial, the State dismissed the two counts involving L.R.S. because she refused to cooperate with the prosecution. The case then proceeded to a joint trial on the two counts involving L.L.S.[2]

At trial, L.L.S. testified that Sandra physically and emotionally abused her for many years. Sandra repeatedly beat L.L.S. with a belt or switch on her back, thighs, or buttocks and punched her in the face and ribs. Occasionally, James and Curtis Jr., held L.L.S. down while Sandra hit her. Sandra also disciplined

---

[1] Where necessary for clarity, we refer to family members by their first names.
[2] Sandra pleaded guilty to fourth degree assault and attempted witness tampering. In a separate trial, a jury found Jamel guilty of one count of third degree rape and one count of attempted third degree rape, both charges involving L.L.S.

L.L.S. by making her squat uncomfortably with her back against the wall for long periods of time. Once, when L.L.S. got tired and slipped down, Sandra threw a can of food at her, causing a serious gash above her eye.

L.L.S. claimed that Sandra always favored the biological children in the family. She forced L.L.S. and her sister to do most of the household chores. She also forbid the sisters from playing with friends or watching television, restrictions that she did not place on the biological children.

While the family was living in Des Moines, L.L.S. would occasionally wet the bed. To resolve the problem, Sandra ordered L.L.S. to wake up by 3:00 a.m. each morning and go to the bathroom. L.L.S. then had to wake up Sandra and confirm that she had gone to the bathroom.

L.L.S. described a specific incident in the Des Moines house that formed the basis for the charge against James. As L.L.S. made her nightly trip to the bathroom, James grabbed her arm and pulled her into the bedroom he shared with Curtis Jr. He then forced her to the floor, removed his clothes, and got on top of her. L.L.S. indicated that James placed his penis "next to" her vagina, but she was uncertain whether there was any penetration. As L.L.S. left, James said, "Don't tell mom."

After leaving James's room, L.L.S. awakened Sandra and told her that she had gone to the bathroom, but she did not report the abuse. L.L.S. claimed that there were "quite a few" similar incidents and that they did not end until James

moved out of the house. L.L.S. alleged that Curtis Jr., began abusing her after James moved out.

James's defense focused on the contradictions in L.L.S.'s various accounts of the charged incident. Defense counsel suggested that L.L.S. fabricated the allegations because her adoptive brothers had failed to protect her from Sandra's physical abuse.

The jury found James guilty as charged of first degree child molestation, and the court imposed a standard range term of 77 months. The jury was unable to reach an agreement on the charge against Curtis Jr.

II

James contends that the trial court erred in denying the joint defense motion for a mistrial. He argues that L.L.S. violated a pretrial ruling by referring to the alleged abuse of her sister and that the violation was sufficiently prejudicial to violate his right to a fair trial.

Prior to trial, counsel for Curtis Jr., moved to exclude hearsay testimony by the investigating detectives that L.R.S. had previously told Sandra and Curtis Sr., that James had touched her inappropriately. Adams' counsel and the deputy prosecutor informed the trial court that the motion was essentially moot because the State had dismissed the charges involving L.R.S. and did not plan to call Sandra or Curtis Sr., as witnesses. The trial court granted the defense motion without further comment.

-4-

During her direct testimony, L.L.S. explained that after James had molested her on her way to the bathroom, she went to Sandra's room as usual, awakened her, and reported that she had used the bathroom. The deputy prosecutor then asked:

Q. Okay. And when you woke your mom up to tell her that you went to the bathroom, did you tell your mom [about the molestation]?

A. No, I didn't, because that wasn't the first incident that he had did something. It was – well, I probably can't bring anything up about my little sister.

Q. Okay. So, in terms of – so you didn't tell your mother about that?

A. No, I didn't tell my mother.

L.L.S. then discussed other occasions when James abused her.

Later, when L.L.S. testified about her interview with Federal Way Police Detective Deyo in October 2007, the deputy prosecutor asked:

Q. Okay. And did you tell him you were being abused?

A. No. I said everything was fine, and none of the stuff that was going on happened, and that my sister was lying.

Q. So you told him that everything was fine?

A. Correct.

Neither defense counsel interposed a contemporaneous objection, but, at the conclusion of L.L.S.'s direct testimony, both defendants moved for a mistrial, arguing that the references to L.R.S. violated the court's pretrial ruling. The deputy prosecutor opposed the motion, noting that that L.R.S.'s "slip" indicated that she was aware she was not supposed to mention anything she heard from L.R.S. The court found L.L.S.'s first comment more "troubling" than the second, but concluded that both comments were too vague to cause significant prejudice and denied the mistrial motion.

The trial court should grant a mistrial "only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). In determining whether a trial irregularity prejudices a defendant's fair trial rights, a court considers (1) the seriousness of the irregularity, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it." Emery, 174 Wn.2d at 765. We review the trial court's denial of a mistrial motion for an abuse of discretion. State v. Post, 118 Wn.2d 596, 620, 826 P.2d 172, 837 P.2d 599 (1992).

James contends that the irregularity was serious because it violated the trial court's pretrial ruling and unfairly bolstered L.L.S.'s credibility.[3] In State v.

---

[3] The State contends that because the trial court's ruling pertained only to Detective Deyo's testimony, L.L.S.'s comments did not violate the ruling. But the deputy prosecutor did not dispute the defense's claim that the testimony violated the trial court's

Escalona, 49 Wn. App. 251, 742 P.2d 190 (1987), a prosecution for second degree assault with a knife, the trial court granted a defense motion to exclude any evidence of the defendant's prior conviction for the same crime. The complaining witness later disclosed that the defendant "already has a record and had stabbed someone." Escalona, 49 Wn. App. at 253. The trial court struck the improper testimony and instructed the jury not to consider it, but denied the defense motion for a mistrial. On appeal, this court reversed, concluding that the curative instruction could not negate the prejudicial effect of the improper testimony.

Unlike Escalona, L.L.S.'s references were nonspecific and oblique at best. To the extent the comments suggested the occurrence of prior bad acts, they did not clearly indicate the nature of the conduct or even the alleged victim. Moreover, the challenged references were brief and isolated. The deputy prosecutor immediately directed the questioning away from L.R.S., and James does not allege that there was any further reliance on the improper testimony. Under the circumstances, the record supports the trial court's observation that the references were likely too vague for the jury to understand.

Evidence that the defendant may have abused L.L.S.'s younger sister was not cumulative. But the potential prejudice was mitigated because the nature of the alleged conduct was unclear. Defense counsel's failure to request a curative

---

ruling. And, in any event, the court and the parties clearly assumed that any references to L.R.S.'s allegations were improper.

instruction, even after the trial court denied the mistrial motion, provides some support for the trial court's decision.[4] James argues that the comments here were so prejudicial that a curative instruction would not have been effective. See Escalona, 49 Wn. App. at 256. But given the nature of the challenged comments, the trial court could have directed the jury not to consider any evidence involving L.R.S. without further identifying or highlighting James's alleged abuse of L.R.S.

Because the determination of whether to grant a mistrial is highly fact specific, the trial judge was necessarily in the best position to assess the prejudicial effect of L.L.S.'s comments in light of her entire testimony and the other evidence in the case. See Escalona, 49 Wn. App. at 256. Viewed in context, the information contained in L.L.S.'s brief and relatively nonspecific references was too attenuated to "impress itself upon the minds of the jurors" or improperly suggest that James was merely acting in conformity with prior conduct. Escalona 49 Wn. App. at 256; see also Post, 118 Wn.2d at 620.

---

[4] Citing State v. Crawford, 21 Wn. App. 146, 584 P.2d 442 (1978), the State asserts that James waived the alleged error because he failed to request a curative instructive *in addition* to moving for a mistrial. But the State fails to address authority holding to the contrary. See, e.g., State v. Claflin, 38 Wn. App. 847, 849-50 n.2, 690 P.2d 1186 (1984) (defendant not required to request curative instruction in addition to objection and motion for mistrial in order to preserve error for appeal). Accordingly, we do not base our resolution of this matter on this averment. State v. Thomas, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004) (appellate court will not review issues unsupported by adequate argument).

James claims that the trial court's reference to the possibility of questioning the jurors about the evidence after the verdict was "a conscience-salving placebo with no chance to cure the prejudice." But the trial court entered no ruling on the issue and merely observed that it was a possibility "if there's any legal basis." The court's decision on the mistrial rested solely on the absence of potential prejudice. The trial court did not abuse its discretion in denying James's mistrial motion.

Affirmed.

We concur:

Dwyer, J.

Cox, J.