2014 JUL 28 AM II: 39


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, )<br>           )<br>      Respondent, )<br>           )<br>      v.       )<br>           )<br>WENDELL OLIVER ADAMS, JR., )<br>           )<br>      Appellant. )<br>_____ ) | DIVISION ONE<br><br>No. 70045-6-I<br><br>UNPUBLISHED OPINION<br><br><br>FILED:  July 28, 2014 |

DWYER, J. – Following a bench trial, the court found Wendell Adams guilty of assault in the first degree while armed with a firearm and unlawful possession of a firearm. On appeal, he challenges the voluntariness of his jury trial waiver and the sufficiency of the evidence to support his assault conviction. The record demonstrates, however, that Adams' jury trial waiver was knowing, intelligent, and voluntary. Evidence that Adams followed and confronted the victim before shooting him was sufficient to establish an intent to commit great bodily harm. The allegations in Adams' statement of additional grounds for review are also without merit. We therefore affirm.

I

The trial court's findings of fact, entered following Adams' bench trial, are essentially unchallenged on appeal. On July 8, 2012, Everett Pitterson went to

the Summerwalk Apartments in Kent to repair a white Chrysler 300M that had broken down in the parking lot. Pitterson drove to the apartments with his friend Carolyn Smith, the owner of the Chrysler, and Smith's daughter, Shanika Mayes. Wendell Adams, who lived in the apartment complex with his wife, was currently dating Mayes. Adams had been driving the Chrysler earlier in the day, and a witness had heard Adams and Mayes arguing in the Chrysler at a nearby grocery store. Pitterson was acquainted with Adams and had seen him several times in the previous weeks.

Shortly after Pitterson began working on the Chrysler, Mayes asked Pitterson and Smith to help her find Adams. Pitterson knocked on several doors but was unable to locate Adams. Mayes and Smith then contacted the apartment maintenance supervisor and learned that Adams lived in apartment G-6.

Pitterson accompanied Mayes and Smith to apartment G-6, which was located on the ground floor, a few steps below the level of the parking lot. Pitterson knocked on the door while Mayes stood behind him on the steps. Smith waited on the sidewalk next to the parking lot.

After a few minutes, Adams opened the door and Mayes told him that Smith wanted to talk with him. In response, Adams went back into his apartment and closed the door. Pitterson then returned to the parking lot.

A short time later, Adams came out of the apartment. Adams, who was wearing a white hooded sweatshirt, walked up to the parking level and confronted Pitterson. Adams appeared to be angry and asked Pitterson why he was there and what he wanted. When Pitterson noticed that Adams was holding a handgun, he backed further into the parking lot and started walking away.

Smith stepped in between the two men and tried to calm Adams down. Smith's efforts were unsuccessful, and Adams fired multiple shots at Pitterson. When Pitterson heard the first shot, he turned back toward Adams. A bullet struck Pitterson in the abdomen, and he fell to the ground. Adams fired several more shots at Pitterson as he lay on the ground. Adams then fled.

Cybel Nava, who lived in apartment G-3, was walking to her car when she noticed two black males who appeared to be arguing in the parking lot. When she heard the sound of a gunshot, she turned and saw one of the men pointing a gun at the other man, who was lying on the ground. The man with the gun was wearing a light gray hooded sweatshirt and fired more shots at the man on the ground before running away. Nava believed that she heard a total of three shots.

A responding police officer and several witnesses worked to control Pitterson's bleeding until he could be transported to a hospital. The responding medics reported that Pitterson had no detectable blood pressure. The single bullet that struck Pitterson destroyed 50 percent of the femoral artery and nicked

his bladder before exiting. Pitterson's injuries required extensive emergency surgical repair. Both Pitterson and Smith identified Adams as the shooter.

The State charged Adams with one count of first degree assault while armed with a firearm and one count of unlawful possession of a firearm. On the morning of trial, Adams informed the court that he wanted to waive his right to a jury trial. After considering the comments of defense counsel and a colloquy with Adams, the trial court granted the request.

At the conclusion of the bench trial, the court found Adams guilty as charged and imposed a 300-month standard range sentence.

II

Adams contends that his convictions must be reversed because his jury trial waiver was constitutionally deficient. In particular, he argues that his waiver was not knowing and voluntary because the record fails to demonstrate that he was expressly advised of his right to a jury trial on the firearm sentence enhancement.

A defendant may waive the right to a jury trial as long as the record demonstrates that he or she acted "knowingly, intelligently, voluntarily, and free from improper influences." State v. Pierce, 134 Wn. App. 763, 771, 142 P.3d 610 (2006). The State bears the burden of demonstrating a valid waiver. State v. Wicke, 91 Wn.2d 638, 645, 591 P.2d 452 (1979). "[E]very reasonable

presumption should be indulged against the waiver of such a right, absent an adequate record to the contrary." Wicke, 91 Wn.2d at 645.

The validity of a jury trial waiver depends on a consideration of all relevant circumstances, including whether the trial court informed the defendant of the right to a jury trial, the nature of any colloquy between the court and the defendant, and whether defense counsel affirmatively stated that the defendant waived the right. See Pierce, 134 Wn. App. at 771. Although not determinative, a written waiver "is strong evidence that the defendant validly waived the jury trial right." Pierce, 134 Wn. App. at 771. We review the validity of a jury trial waiver de novo. State v. Ramirez-Dominguez, 140 Wn. App. 233, 239, 165 P.3d 391 (2007).

Contrary to Adams' assertions, the record need not demonstrate that the defendant understood all of the consequences of a jury trial waiver. State v. Stegall, 124 Wn.2d 719, 725, 881 P.2d 979 (1994); see also State v. Benitez, 175 Wn. App. 116, 128-29, 302 P.3d 877 (2013). Nor does a valid jury trial waiver require an extensive colloquy on the record. Stegall, 124 Wn.2d at 725. Rather, "all that is required is a personal expression of waiver from the defendant." Stegall, 124 Wn.2d at 725. Adams has not cited any authority supporting his claim that the record must reflect that he was expressly advised of his right to a jury trial on a firearm sentence enhancement. Cf. Pierce, 134 Wn.

App. at 773 (valid jury trial waiver does not require that defendant be advised of his right to participate in jury selection).

Here, defense counsel informed the trial court that he had discussed the jury trial waiver extensively with Adams and was satisfied that he had "full knowledge of the consequences of the jury trial." Defense counsel noted that the discussion included "all aspects of jury selection," presentation of the case, including evidentiary and pretrial rulings, the nature of the judge's role in a bench trial, and the contrasting aspects of the judge's and jury's determinations of whether the State had proved guilt beyond a reasonable doubt.

After defense counsel's statement to the court, Adams orally acknowledged that he had sufficient time to discuss the consequences of a jury trial with counsel, that he had a "full discussion" about the differences between a bench trial and jury trial, and that he had no further questions. Adams also signed a written waiver acknowledging his understanding that he had the right to have a jury of 12 decide "my case" and that all 12 jurors would have to agree that the State proved the elements of the charged crimes beyond a reasonable doubt. At the conclusion of the colloquy with the court, Adams confirmed that the signature on the written waiver form was his and manifested his understanding of the statements on the form.

The foregoing circumstances, including defense counsel's representations to the court, Adams' colloquy with the court, and the execution of a written

waiver, established Adams' personal desire to waive a jury trial and demonstrated that his waiver was knowing, intelligent, and voluntary. See Benitez, 175 Wn. App. at 129-30; see also State v. Cham, 165 Wn. App. 438, 449, 267 P.3d 528 (2011), review granted and case remanded on other grounds, 175 Wn.2d 1022 (2012).

III

Adams next contends that the evidence introduced at trial was insufficient to support his conviction for first degree assault. He maintains that the State failed to prove that he assaulted Pitterson with the specific intent to cause great bodily harm.

An appellate court reviews the sufficiency of the evidence to determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. State v. Pirtle, 127 Wn.2d 628, 643, 904 P.2d 245 (1995). The same standard applies whether the case was tried to the bench or to a jury. See Jackson v. Wyoming, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (bench trial); State v. Green, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980) (jury trial). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). Circumstantial evidence and direct evidence are equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d

99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Myers, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997).

In order to convict Adams as charged, the State had to prove that he assaulted Pitterson with the specific intent "to inflict great bodily harm." RCW 9A.36.011(1); State v. Elmi, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). Specific intent is the intent "to produce a specific result, as opposed to intent to do the physical act that produces the result." Elmi, 166 Wn.2d at 215. Specific intent cannot be presumed, but it can be inferred as a logical probability from all the facts and circumstances. State v. Pedro, 148 Wn. App. 932, 951, 201 P.3d 398 (2009). Relevant circumstances include "'the manner and act of inflicting the wound, . . . the nature of the prior relationship and any previous threats.'" State v. Ferreira, 69 Wn. App. 465, 468, 850 P.2d 541 (1993) (quoting State v. Woo Won Choi, 55 Wn. App. 895, 906, 781 P.2d 505 (1989)).

A short time after Pitterson knocked on Adams' door, Adams followed him to the parking lot and confronted him while holding a handgun. Adams, who appeared to be angry, asked Pitterson why he was there and what he wanted. Despite the efforts of Carolyn Smith, Adams then fired several shots at Pitterson. One of the bullets hit Pitterson in the abdomen and he fell to the ground, severely injured. Adams then stood over Pitterson and fired several more rounds at him. Viewing the evidence in the light most favorable to the State, a rational trier of

fact could conclude beyond a reasonable doubt that Adams assaulted Pitterson with the intent to commit great bodily harm. See Pedro, 148 Wn. App. at 951-52 (evidence of prior altercations and fact that defendant ran after victim and fired in his direction were sufficient to establish intent to inflict great bodily harm).

Adams contends that the fact that all but one of his shots missed Pitterson "suggests the absence of an intent to actually strike or injure the person; i.e., the absence of an intent to cause great bodily harm." But this argument must be directed to the trier of fact. It does not undermine the legal sufficiency of the evidence, which is reviewed in the light most favorable to the State.

IV

In his statement of additional grounds for review, Adams contends that the trial judge violated the appearance of fairness doctrine because she was acquainted with the victim's mother, who was an attorney with a public defender agency. But Adams raises this allegation for the first time on appeal. Because an appearance of fairness claim is not a "constitutional" claim pursuant to RAP 2.5(a)(3), an appellate court will generally not consider it for the first time on appeal. State v. Morgensen, 148 Wn. App. 81, 90-91, 197 P.3d 715 (2008). In any event, Adams' contentions are without merit.

To prevail on an appearance of fairness claim, Adams must present evidence of the judge's actual or potential bias. State v. Post, 118 Wn.2d 596, 618-19, 826 P.2d 172, 837 P.2d 599 (1992). The "critical concern in determining

whether a proceeding satisfies the appearance of fairness doctrine is how it would appear to a reasonably prudent and disinterested person." Chi., Milwaukee, St. Paul. & Pac. R.R. Co. v. Wash. State Human Rights Comm'n, 87 Wn.2d 802, 810, 557 P.2d 307 (1976). Trial judges are presumed to perform their functions regularly and properly, without prejudice or bias. Jones v. Halvorson-Berg, 69 Wn. App. 117, 127, 847 P.2d 945 (1993).

Prior to trial, defense counsel informed the trial judge that the victim's mother was an attorney with a public defender agency and asked if "the Court would find that to be any reason for concern in managing this case, because the Court has contact with [the agency] in a professional capacity." The judge responded that "I know who she is but I don't have a personal relationship with her." Defense counsel did not inquire further and raised no objection, and Adams has not identified any court action or comment that reflected actual or potential bias. A trial judge's acquaintance with an attorney who may appear before the judge in a professional capacity does not, without more, raise an appearance of fairness concern requiring recusal. See State v. Leon, 133 Wn. App. 810, 812, 138 P.3d 159 (2006) (an attorney's frequency of appearance before a judge does not, without more, create an appearance of partiality that requires recusal from a matter in which the judge would assess the credibility of the attorney's testimony).

No. 70045-6-/11

Adams also contends that the evidence was insufficient to prove intent to inflict great bodily harm. For the reasons already stated, we reject this contention.

Affirmed.

We concur: