[Nos. 22941-2-II; 23061-5-II.   Division Two.   June 11, 1999.]
THE STATE OF WASHINGTON, *Respondent*, v. TERRY L.
JACOBSEN, *Appellant*.

*Law Offices of Sverre O. Staurset, P.S.*, by *Sean P. Wickens*, for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney*, and *John C. Hillman* and *Barbara L. Corey-Boulet, Deputies*, for respondent.

ARMSTRONG, J. — Terry L. Jacobsen moved for accelerated review of the manifest injustice disposition imposed following his juvenile court adjudication of guilt of two counts of child molestation in the first degree. Jacobsen argues (1) the court-ordered psychological and polygraph tests violated his constitutional protection against self-incrimination, and (2) the trial court abused its discretion by imposing a manifest injustice disposition. We affirm.

## FACTS

Terry Jacobsen appeals a Pierce County Superior Court, Juvenile Department, disposition in excess of the Juvenile Justice Act standard range. The sentence was imposed following his adjudication of guilty of two counts of child molestation in the first degree, RCW 9A.44.083. The standard range is 8-12 weeks confinement per count. The juvenile court imposed a 26-week commitment for each count, to be served consecutively. Jacobsen moved for accelerated review. RAP 18.13.

In two separate cases, the State charged Jacobsen with six counts of first-degree child molestation. The cases were consolidated for trial and appeal. The victims were in the care of Jacobsen's mother, who ran a day care out of her home. One of the victims, D.R., is Jacobsen's cousin and was five years old at the time of the offense. The other victim, a six-year-old child, D.E., regularly attended the day care. Jacobsen was twelve years old when the offenses occurred. After a trial, the juvenile court adjudicated Jacobsen guilty of one count of child molestation in each case.

At the disposition hearing, Jacobsen requested additional time to obtain a psychosexual evaluation. The State then asked for a second evaluation from a state-approved treatment provider to determine Jacobsen's amenability to treatment. Although Jacobsen conceded the State was entitled to the evaluation, he objected because the evaluator, Michael Comte, required polygraph testing as part of the evaluation. Nevertheless, the court ordered a second evaluation.

The State subsequently moved to compel Jacobsen to submit to the psychosexual evaluation. Jacobsen objected to the polygraph examination as part of the court-ordered evaluation. Jacobsen's probation counselor, Marty Robinson, testified that polygraph testing was a standard part of a psychosexual evaluation. Robinson further testified that both of the treatment providers customarily used by the court for psychosexual evaluations required polygraph testing. The court then ordered Jacobsen to submit to polygraph testing as part of the psychosexual evaluation.

At the disposition hearing, the State recommended a manifest injustice sentence of a 52-week commitment to the Juvenile Rehabilitation Administration (JRA). The State offered the testimony of Comte in support of its sentencing recommendation. Jacobsen objected, arguing that admission of evidence obtained during the psychosexual evaluation would violate his right against self-incrimination. The court allowed Comte's testimony.

Comte testified that he completed a psychosexual evaluation of Jacobsen and relied upon interviews, school records, investigative reports, and the polygraph results in compiling his report. Comte testified that polygraph testing by state-certified sex offender treatment providers is standard in the industry. Jacobsen denied any sexual misconduct to the polygraph administrator, and this answer was found to be deceptive. Comte opined that Jacobsen had a "sexual deviation, specifically: [a]n attraction to prepubescent males." Based upon his interviews, the psychological testing and the polygraph test, he also opined that Jacobsen had an entrenched denial of the sexual misconduct for which he was convicted. Comte recommended a 52-week commitment to ensure adequate treatment of Jacobsen's sexual deviancy.

In addition to this testimony and testimony from Robinson, the court considered Comte's psychosexual evaluation and Robinson's original and amended reports. Comte's written evaluation supported his testimony and concluded, "I do not consider [Jacobsen] safe to be at large and I consider him at significant risk for further sexually assaultive behavior."

The juvenile court probation department, relying primarily on Comte's evaluation, also recommended a manifest injustice sentence of a 52-week commitment to JRA. Robinson explained that her initial report recommended a standard range sentence, but her recommendation changed after reviewing the psychosexual evaluation prepared by Comte.

In adopting the State's recommendation of 52 weeks, the court relied upon three factors: (1) the victims were particularly vulnerable; (2) Jacobsen abused a position of trust; and (3) Jacobsen presented a future danger to society.

Jacobsen appealed, the cases were consolidated, and we granted accelerated review.

## ANALYSIS

### A. Psychological Testing

Jacobsen contends that the results of the court-ordered psychological test were inadmissible at the disposition hearing because the evidence was obtained in violation of his constitutional protection against self-incrimination. Jacobsen argues that because the court ordered him to submit to a psychological evaluation and then used the results to increase his sentence, the State compelled him to testify against himself.

■ "The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that no person 'shall be compelled in any criminal case to be a witness against himself.' " *State v. King*, 130 Wn.2d 517, 523, 925 P.2d 606 (1996). This prohibition not only permits an individual to refuse to testify against himself at a criminal trial in which he is a defendant, but it also " 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973)). The availability of the Fifth Amendment privilege does not turn on the type of proceeding in which its protection is invoked, but upon the nature of the statement and the exposure it invites. *State v. Post*, 118 Wn.2d 596, 604, 826 P.2d 172, 837 P.2d 599 (1992); *In re Application of Gault*, 387 U.S. 1, 49, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967).

■ Generally, to obtain Fifth Amendment protection, a person must invoke the privilege against self-incrimination, i.e., refuse to answer. *Murphy*, 465 U.S. at 427 (citing *Garner v. United States*, 424 U.S. 648, 654, 96 S. Ct. 1178, 47 L. Ed. 2d 370 (1976)). Otherwise, the individual " 'will

not be considered to have been "compelled" within the meaning of the Amendment.'" *Murphy*, 465 U.S. at 427 (quoting *United States v. Monia*, 317 U.S. 424, 427, 63 S. Ct. 409, 87 L. Ed. 376 (1943)). But failure to claim the privilege is excused where: (1) a state agent interrogates a person in custody; or (2) assertion of the privilege is penalized (Jacobsen does not contend that he was threatened with a penalty). *Murphy*, 465 U.S. at 429, 434.

■ "[S]elf-incriminating statements obtained from an individual in custody are presumed to be involuntary, and to violate the Fifth Amendment, unless the State can show that they were preceded by a knowing and voluntary waiver of the privilege." *State v. Sargent*, 111 Wn.2d 641, 648, 762 P.2d 1127 (1988). *Miranda* warnings,[1] which provide the information for a knowing waiver, should be given when there is a custodial interrogation by an agent of the state. *State v. Warner*, 125 Wn.2d 876, 884, 889 P.2d 479 (1995); *State v. Walton*, 64 Wn. App. 410, 413, 824 P.2d 533 (1992) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966)). Comte did not advise Jacobsen of his Fifth Amendment rights and Jacobsen did not assert them during his interview with the doctor. Thus, to determine whether Jacobsen voluntarily waived his right against self-incrimination, we must examine whether he was in "custody."[2]

■ The Court discussed whether the defendant was "in custody" in *Minnesota v. Murphy*. There, after a treatment counselor informed Murphy's probation officer that he had confessed to a rape and murder in 1974, the officer requested a meeting with Murphy. When Murphy met with his probation officer in her office, he admitted committing the rape and murder. Although Murphy was subject to a number of restrictive conditions governing various aspects

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

[2] Whether a person is in custody for purposes of *Miranda* is a factual question, which is dependent upon the particular circumstances of the case. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983).

of his life, the Court concluded he was not "in custody" for purposes of receiving *Miranda* protection. "Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. It is unlikely that a probation interview, arranged by appointment at a mutually convenient time, would give rise to a similar impression." *Murphy*, 465 U.S. at 433. Because Murphy was not physically restrained and could have left the office, the Court concluded that his situation "was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." *Id.*

In *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), the defendant, on parole, voluntarily came to the police station in response to a police request. When he arrived, he was immediately informed that he was not under arrest. The defendant gave a one-half hour interview, during which he confessed to a burglary. After his confession, the defendant left the police station without hindrance. The Court concluded he was not in custody for *Miranda* purposes.

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Mathiason*, 429 U.S. at 495.

Here, although Jacobsen was ordered to attend the psychological evaluation, the appointment was arranged at a mutually convenient time and he arrived with his mother. Jacobsen was evaluated at the doctor's office and was not physically restrained in any manner. Further, Jacobsen did

not ask for his attorney to be present during the interview and the court entered no order prohibiting counsel from attending. Finally, Jacobsen was free to leave and in fact returned home with his mother after the conclusion of the interview. Accordingly, we hold that Jacobsen was not "in custody" during the psychological evaluation.[3]

Because Jacobsen was not in custody during the Comte interview, the privilege against self-incrimination was not self-executing, and Jacobsen waived his Fifth Amendment rights by failing to assert it. *See State v. Escoto*, 108 Wn.2d 1, 6, 735 P.2d 1310 (1987) (held that because defense counsel chose not to be present at the evaluation and the juvenile participated without objection and without asserting his right to remain silent, "there was a waiver"). The admission of the psychological examination results was not error.

## B. Polygraph Examination

Jacobsen also argues that admitting the polygraph test results at the disposition hearing violated his constitutional protection against self-incrimination. Before the trial court, Jacobsen raised two objections: (1) such examinations are not authorized by RCW 13.40.160, and (2) the results of polygraph tests are not admissible evidence except by stipulation of the parties.

Jacobsen correctly notes that RCW 13.40.160 does not specifically authorize or require polygraph testing. But the stated purposes of the Juvenile Justice Act include determining whether accused juveniles have committed offenses and providing necessary treatment, supervision, and custody for juvenile offenders. RCW 13.40.010(2)(f). The purposes underlying the juvenile justice system and the procedures used to effect those purposes differ significantly

---

[3]It is also clear that Jacobsen was not interrogated by a "state agent." *See Warner*, 125 Wn.2d at 885-86 (counselors at juvenile correctional facility are state employees, but are not of the type that would create a "police-dominated atmosphere").

from those of the adult criminal justice system, particularly in the area of sentencing. *State v. Rice*, 98 Wn.2d 384, 392, 655 P.2d 1145 (1982). The juvenile justice system is unique in that it places more importance on rehabilitating the offender. *State v. Bennett*, 92 Wn. App. 637, 641, 963 P.2d 212 (1998).

█ Washington courts have long recognized polygraph examinations as a useful investigatory tool. In *Seattle Police Officers' Guild v. City of Seattle*, 80 Wn.2d 307, 494 P.2d 485 (1972), the court attributed probative value to a polygraph test and held:

> [I]f . . . the investigating authority determines it reasonably necessary to utilize the polygraph examination as an investigatory tool to test the dependability of prior answers of suspected officers to questions specifically, narrowly, and directly related to the performance of their official duties, then, such investigating authority may properly request such officers to submit to a polygraph test under pain of dismissal for refusal.

*Seattle Police Officers' Guild*, 80 Wn.2d at 320. In *State v. Sutherland*, 94 Wn.2d 527, 617 P.2d 1010 (1980), the court affirmed this principle. "[W]e want to make it clear that nothing said herein is intended to discredit the polygraph as a tool in police investigations." *Id.* at 528.

Similarly, in *State v. Cherry*, 61 Wn. App. 301, 810 P.2d 940 (1991), the court permitted the use of polygraph results to determine the existence of probable cause. The court noted that "[w]hile admissibility of polygraph results at trial is strictly limited, it is recognized that they have probative value. Polygraph examinations have long been recognized as valid and important police investigative tools." *Id.* at 305 (citations omitted).

Most recently, the court upheld polygraph testing during community placement as a monitoring method. *State v. Riles*, 135 Wn.2d 326, 342, 957 P.2d 655 (1998). In *Riles*, the appellant objected to a requirement that he submit to polygraph testing as a crime-related prohibition of his

mandatory "community placement" following his release from prison. *Id.* at 334. The court observed that, "[a]lthough the results of polygraph tests are generally not admissible in a trial, this Court has acknowledged their validity as an investigative tool." *Id.* at 342 (citations omitted). The court then concluded that the trial court had authority to order polygraph testing during community placement to ensure compliance with the conditions of community placement. *Id.* at 343.

Allowing trial courts to administer polygraph tests to sex offenders is also consistent with the guidelines provided in WAC 246-930-310(7)(b) for therapists working with sex offenders:

> The use of the polygraph examination may enhance the assessment, treatment and monitoring processes by encouraging disclosure of information relevant and necessary to understanding the extent of present risk and compliance with treatment and court requirements.

WAC 246-930-310(7)(b). While this provision does not purport to give trial courts actual statutory authority to require polygraph examinations, it does recognize the usefulness of the procedure for assessment and treatment purposes.

Accordingly, we conclude that the trial court had authority to order polygraph testing as part of the psychological evaluation of Jacobsen even though not specifically authorized by RCW 13.40.180 and not stipulated to by the parties.

### C. Manifest Injustice Disposition

Jacobsen next contends the State failed to present clear and convincing evidence in support of its claim for an exceptional sentence as required by RCW 13.40. The State maintains the trial court acted within its discretion in imposing a manifest injustice sentence.

■ ■ The juvenile court may impose a disposition in

excess of the standard range only when the court determines that the imposition of a standard range would effectuate manifest injustice. RCW 13.40.160(2). Manifest injustice results if the standard range sentence "would impose a serious, and clear danger to society in light of the purposes of this chapter." RCW 13.40.020(17). A finding of manifest injustice is reviewed pursuant to RCW 13.40.230(2), which provides:

> To uphold a disposition outside the standard range, the court of appeals must find (a) that the reasons supplied by the disposition judge are supported by the record which was before the judge and that those reasons clearly and convincingly support the conclusion that a disposition within the range would constitute a manifest injustice, and (b) that the sentence imposed was neither clearly excessive nor clearly too lenient.

The juvenile court's determination to declare a manifest injustice is reviewed for abuse of discretion. *State v. Sledge*, 133 Wn.2d 828, 844, 947 P.2d 1199 (1997). If one or more of the factors relied upon by a trial court to support a manifest injustice disposition are supported by the record, we will affirm the decision. *State v. S.H.*, 75 Wn. App. 1, 12, 877 P.2d 205 (1994). The juvenile court found three supporting factors: (1) the victims were particularly vulnerable; (2) Jacobsen abused a position of trust; and (3) Jacobsen presented a future danger to society.

### D. Victim Vulnerability

Jacobsen argues that his age in relation to the victims' precludes the court's reliance on victim vulnerability to support a manifest injustice sentence. Because Jacobsen was himself a "child of a very young age," he maintains that the purpose behind this aggravating factor is not met.

Particular vulnerability of the victim is a statutory aggravating factor under RCW 13.40.150(3)(i)(iii). A victim's extreme youth may constitute an aggravating factor even if

the victim's age is an element of the crime.[4] *State v. Chadderton*, 119 Wn.2d 390, 395-96, 832 P.2d 481 (1992). In *State v. Fisher*, 108 Wn.2d 419, 425, 739 P.2d 683 (1987), the court imposed an exceptional sentence for indecent liberties against a five-and-one-half-year-old victim. The court held that the victim's age rendered him particularly vulnerable and incapable of resisting defendant's actions, and that the defendant knew of this vulnerability. *Fisher*, 108 Wn.2d at 425; *see also State v. J.S.*, 70 Wn. App. 659, 661, 855 P.2d 280 (1993) (four-year-old held to be "particularly vulnerable" due to extreme youth); *State v. J.N.*, 64 Wn. App. 112, 113, 823 P.2d 1128 (1992) (five-year-old held to be "particularly vulnerable" due to extreme youth).

Here, D.R. was five years old at the time of the offense. This evidence alone supports the court's finding that D.R. was particularly vulnerable. *See Fisher*, 108 Wn.2d at 425. D.E. was six years old at the time of the offense. Only one year older than D.R., D.E.'s young age could support the court's finding that he was "particularly vulnerable." *Id.*; *but see State v. Woody*, 48 Wn. App. 772, 777, 742 P.2d 133 (1987) (with respect to crime of indecent liberties, seven-year-old not particularly vulnerable by virtue of her age alone). Further, there existed a six-year age difference between D.E. and Jacobsen at the time of the offense.

Jacobsen argues that "[t]he clear policy and purpose of this exception . . . is to recognize additional culpability in situations involving a significant 'emotional' and 'psychological' disparity between a victim and perpetrator." Because he was only 12 years old, Jacobsen maintains that this disparity did not exist in his case. Because Jacobsen has provided no authority to support the position that a lesser age difference between the victim and perpetrator negates victim vulnerability, his argument fails.[5] The juvenile court did not abuse its discretion by imposing a

---

[4]For first degree child molestation, the victim must be younger than 12 and the offender at least 36 months older than the victim. RCW 9A.44.083.

[5]Washington courts have recognized that the defendant's familial relationship and role as caretaker are also relevant factors when determining particular

manifest injustice sentence based upon the particular vulnerability of these victims.

### E. Abuse of Trust

■■ ■■ Jacobsen argues that the State failed to establish he was in a significant trust relationship with the victims. Because he was not responsible for caretaking functions, Jacobsen maintains he had no trust relationship with the victims.

"The relevant factors in determining whether a defendant abused a position of trust are the duration and degree of the relationship involved." *J.S.*, 70 Wn. App. at 665. "A familial relationship is sufficient to establish a trust relationship[,] " but it is not essential. *Id.* at 666. In *Fisher,* the defendant sexually assaulted a five-and-one-half-year-old boy who asked the defendant to accompany him to the rest room. The victim met the defendant only a few days prior to the incident. *Fisher,* 108 Wn.2d at 427. The court noted that it was a "close question" whether the evidence was sufficient to find abuse of trust, reasoning:

> A relationship extending over a longer period of time, or one within the same household, would indicate a more significant trust relationship, such that the offender's abuse of that relationship would be a more substantial reason for imposing an exceptional sentence.

*Fisher,* 108 Wn.2d at 427.

In *State v. Grewe,* 117 Wn.2d 211, 813 P.2d 1238 (1991), the victim had known the defendant for approximately four months prior to the crime. During that time, the child was a frequent visitor in defendant's home where she played with his computer and piano. Finding the relationship exceeded that in *Fisher,* the court held that the record pre-

---

vulnerability. *See State v. Brown,* 55 Wn. App. 738, 754, 780 P.2d 880 (1989) (citing *State v. Harp,* 43 Wn. App. 340, 343, 717 P.2d 282 (1986); *State v. Shephard,* 53 Wn. App. 194, 199, 766 P.2d 467 (1988)). As both of these factors exist in this case, the finding of particular vulnerability is further supported.

sented substantial evidence to support the finding that the defendant abused a position of trust. *Id.* at 219. "One aspect of children's extreme vulnerability is their tendency to trust. Arguably, defendant preyed upon this tendency by luring the victim into his house to play with his piano and computer, thereby establishing a relationship of trust." *Id.* at 221 (citations omitted). Further, "there need not be direct evidence that the position of trust was relied upon to perpetrate the crime." *J.S.*, 70 Wn. App. at 666.

As D.R. is Jacobsen's cousin, this fact alone establishes a trust relationship. *See id.* at 666. Jacobsen molested D.E. while he attended day care at Jacobsen's house. D.E., who was six years old at the time, attended this day care four days per week for about one year. Jacobsen, 12 years old when the offenses occurred, was the daycare provider's son and molested D.E. in the backyard of the day care. Based on the duration in which D.E. attended day care, Jacobsen's position as the day-care provider's son, Jacobsen's access to D.E., and Jacobsen's age, there is substantial evidence that Jacobsen was in a position to engender trust with D.E. *Grewe*, 117 Wn.2d at 219. The juvenile court did not abuse its discretion by imposing a manifest injustice sentence based upon an abuse of a position of trust.

### F. Risk of Reoffense

Finally, Jacobsen contends that his denial of the offenses is not an appropriate basis for a manifest injustice sentence. Because such an interpretation selectively punishes defendants who choose to go to trial rather than pleading guilty, Jacobsen argues the result violates equal protection.

Protection of society from dangerous juvenile offenders is an appropriate basis for a disposition outside the standard range. *S.H.*, 75 Wn. App. at 11. A trial court's finding that a juvenile poses a high risk to reoffend is re-

versible only if the finding is not supported by substantial evidence in the record. *J.N.*, 64 Wn. App. at 114. A juvenile offender's denial of his or her criminal acts is a relevant factor for the court to consider when deciding whether a juvenile poses a high risk to reoffend. *Id.* at 114.

In *State v. J.N.*, 13-year-old J.N. was convicted of sexually assaulting a five-year-old child. A sex-offender treatment provider who evaluated J.N. concluded that J.N. posed a high risk to reoffend in part because J.N. continued to deny committing the offense. *Id.*

In *State v. J.S.*, the defendant challenged the court's determination that in light of his denial, he presented a danger to society. The court rejected defendant's argument that by focusing on his denial he was penalized for his professed innocence. Instead, the court noted:

> [T]he [trial] court considered J.S.' denial as relevant from a treatment perspective. As Rawlings testified, effective sex offender treatment requires admission by the offender that he has a problem and needs help. Because the juvenile system retains treatment and rehabilitation of the offender as a goal, unlike the adult system, the trial court properly considered denial as relevant for purposes of affording effective treatment.

*J.S.*, 70 Wn. App. at 664 (citing *Rice*, 98 Wn.2d at 392-93).

Similarly, here Comte testified that Jacobsen was in denial of his sexual deviancy, which he would have to overcome in order to prevent "further sexually assaultive behavior." Comte also testified that Jacobsen presented a higher risk to reoffend than offenders who acknowledged their wrongdoing. In addition, Comte's written evaluation concluded that Jacobsen presented a "significant risk to reoffend." This evidence is sufficient to support a finding of future dangerousness.

As all three factors relied upon by the trial court to support the manifest injustice disposition are supported by the

record, we affirm the manifest injustice disposition. *S.H.*, 75 Wn. App. at 12.

Affirmed.

BRIDGEWATER, C.J., and MORGAN, J., concur.