

FILED
COURT OF APPEALS D... T
STATE OF WASHINGT...

2015 SEP 28 AM 9: 3.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Dependency of | NO. 72656-1-I |
| C.T., <br> Minor. | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | DIVISION ONE |
| Respondent, | |
| v. | |
| KARINA TORRESCANO-HERNANDEZ, | UNPUBLISHED OPINION |
| Appellant. | FILED: September 28, 2015 |

LAU, J. — Karina Torrescano-Hernandez appeals an order terminating her parental rights to her son, C.T. Torrescano argues the trial court's order should be reversed because (1) requiring Torrescano to admit that she burned her son's hands violated her Fifth Amendment right against compelled self-incrimination, (2) her counsel was ineffective for failing to assert that right, (3) the State's failure to provide notice of

her parental deficiencies violates due process, (4) the State failed to prove there was little likelihood that additional services would be futile, (5) the State failed to prove there was little likelihood conditions could be remedied so that C.T. could be returned to Torrescano, and (6) the State failed to prove RCW 13.34.180(1)(d) and (e) by clear, cogent, and convincing evidence. We conclude that Torrescano's Fifth Amendment privilege was not self-executing, she fails to show her counsel's performance was either deficient or prejudicial, and the State satisfied all necessary elements of RCW 13.34.180. We affirm the order of termination.

## FACTS

Karina Torrescano-Hernandez is the mother of C.T., born in Mexico on May 27, 2006.[1] In September 2012, the State filed a dependency petition based on allegations that Torrescano burned C.T's hands on a stove to discipline him. C.T. said his mother burned his hands because she was upset that he had taken a friend's iPod. Torrescano denied burning C.T.'s hands. The dependency petition alleged that C.T. had been abused and that he had no parent capable of adequately caring for him under RCW 13.34.030(6)(b) and (c). The State filed an amended petition on October 1, 2012, alleging that Torrescano also previously hit C.T. with a shoe and a spoon. On November 2, 2012, the State charged Torrescano with assault of a child in the second degree (domestic violence). It later amended the charge to include deliberate cruelty.

On December 6, 2012, the parties entered an agreed order of dependency. Torrescano stipulated that C.T. was dependent because she had been charged with second degree assault of a child, was incarcerated, and was incapable of caring for

---

[1] C.T.'s father and brother, N.T., are not involved in this appeal.

C.T. In the order of dependency, Torrescano stipulated that any convictions or plea agreements related to the pending criminal charges would become part of the basis for C.T.'s dependency. She further stipulated that two required services, psychological evaluation and a domestic violence perpetrator's assessment, would commence after the criminal case was resolved.

On June 14, 2013, a jury convicted Torrescano of the lesser included offense of assault of a child in the third degree. The court sentenced Torrescano to three months in jail with credit for time served. The court also included a no contact order preventing Torrescano from contacting C.T. until June 14, 2018. The court noted that the no-contact order would be subordinate to all future orders relating to contact between C.T. and Torrescano.

Torrescano, a Mexican-born citizen residing illegally in the United States, was sent to the U.S. Immigration and Customs Enforcement (ICE) detention center shortly after completing her jail sentence. On November 14, 2013, the State filed a petition to terminate Torrescano's parental rights while she was still detained at the ICE facility in Tacoma, Washington. She remained in detention until March 2014, when ICE granted Torrescano temporary asylum from deportation until the dependency case was resolved. After Torrescano's release from detention, the State made referrals for the two court-ordered services in the October 2012 dependency order—a psychological evaluation and a domestic violence perpetrator's assessment.

The termination trial took place on August 18-20 and September 8, 2014, two months after Torrescano completed the court ordered services. The court heard extensive testimony from the following witnesses: Torrescano; Frederica Rose and

Sarah Cope, two different social workers tasked with managing Torrescano's case; Dr. David Morgan, who performed a psychological evaluation of Torrescano; Ted Vidan, who conducted a domestic violence assessment of Torrescano; Janelle Ibsen, a board certified physician's assistant who examined C.T. after the burning incident; Marty Quintana, C.T.'s Guardian Ad Litem; Crystal Hynek and Lorencita Villegas, two therapists who treated C.T.; and C.T.

Dr. David Morgan, a licensed psychologist who performed the psychological evaluation for Terrescano, testified that Torrescano would not be capable of caring for C.T. in the furture:

> Ms. Torrescano-Hernandez is currently in denial regarding the elements of her conviction . . . it is difficult for individuals to make needed and lasting changes to their behavior if they do not acknowledge the behaviors in the first place. While Ms. Terroscano-Hernandez does not have any diagnosed mental health issues, the fact that she is in denial regarding the convicted behavior could impact her ability to effectively parent her child.
>
> . . .
>
> [Because of] the fact that she is in denial regarding the details of her conviction, it is not likely that Ms. Torrescano-Hernandez would be capable of adequately and consistently caring for [C.T.] in the foreseeable future. She would have to take greater accountability for her behavior and start to address the underlying issues that motivated this behavior in the first place in order to move forward.

Report of Proceedings (RP) (Aug. 19, 2014) at 15-18. Dr. Morgan also believed that future treatment would not be effective for Torrescano because "it's difficult for people to work on a problem that they don't see is a problem." RP (Aug. 19, 2014) at 17. He stated that, under the circumstances, C.T. should not be forced to have contact with Torrescano.

-4-

Ted Vidan, who conducted Torrescano's domestic violence assessment, also testified. Like Dr. Morgan, Vidan testified that Torrescano denied burning C.T.'s hands. Vidan nevertheless believed that Torrescano posed no risk to C.T. He stated that Torrescano would benefit from a parenting class focused on appropriate discipline. But on cross-examination, Vidan conceded that Torrescano's denial could be a problem because "without accountability, we don't know how sincere a person is in correcting." RP (Aug. 19, 2014) at 102.

The court also heard testimony from Janelle Ibsen, a board certified physician's assistant who conducted the first medical examination of C.T. after the burning incident. Ibsen noted that it was unusual to see burns on both hands, so she asked C.T. how the burns occurred. C.T. told her that Torrescano "had gotten extremely upset at him and then, therefore, taken his hands and burnt them on the stove top." RP (Sept. 8, 2014) at 65-66. Ibsen believed the burn marks on C.T.'s hands were consistent with C.T.'s explanation of events. When Ibsen proceeded with her examination "from a head to toe fashion," she noticed "various scars and dark marcations all over [C.T.'s] body." RP (Sept. 8, 2014) at 66. When she asked C.T. what happened, he told her that his mother had pinched his thighs and hit him with various objects.

Crystal Hynek testified that she treated C.T. as his therapist from March 2013 to September 2013. Hynek stated that C.T. was doing well with his foster parents and that he did not want to be removed from his current placement with them. C.T. told Hynek that Torrescano hit him and burned his hands. C.T. also told Hynek that he was afraid of Torrescano, that he was afraid to testify at the criminal trial, and that he was afraid Torrescano would take him away.

-5-

In February 2014, C.T. re-enrolled in therapy with Lorencia Villegas. C.T. was having problems with stealing and lying at home. C.T. told Villegas that he did not feel safe. C.T. experienced frequent nightmares and crying spells at night. Villegas testified that C.T.'s behavior was largely due to fear of Torrescano. For example, C.T. expressed feeling nervous and scared when Torrescano was released from jail. C.T. told Villegas that he felt safe with his foster parents and asked her when he was going to be adopted. Villegas believed C.T.'s mental health would deteriorate if he was removed from his foster parents. She stated that C.T. had adjusted well at school, made friends, and participated in extracurricular activities. C.T. felt anxious about not knowing when he would be adopted. Villegas stated that resolving the issue of C.T.'s permanent placement was crucial to his mental health.

Sarah Cope, the social worker managing C.T.'s case, provided similar testimony. She stated that C.T. had adjusted well to his placement with his foster parents and that he wanted to be adopted by them. Cope believed that termination of Torrescano's parental rights was in C.T.'s best interests so that he could gain permanency in a stable home.

Torrescano also testified. She acknowledged that she had been convicted of third degree assault of a child, but denied that she had burned his hands. Torrescano believed she was ready to provide a home for C.T. that day. She believed that she did not need any help or services. She could not think of any reason why C.T. should not be returned to her immediately. Torrescano stated that she did not take C.T. to a doctor after the burning incident because of her immigration status and the fear that she might be deported.

-6-

C.T. was eight-years-old when he testified at the termination trial. He stated that Torrescano burned his hands on the stove and that it was not an accident. C.T. said he did not want to live with Torrescano. He stated that he wanted to live with his foster parents "forever," "[b]ecause they won't hurt me." RP (Sept. 8, 2014) at 78.

After the trial, the court granted the State's petition to terminate Torrescano's parental rights pursuant to RCW 13.34.180 and .190. The court based its conclusion on Torrescano's history of inappropriate punishment, her inability to acknowledge that history and thereby correct it, and C.T.'s resulting emotional trauma:

> It is in the best interest of the child that all of the parental rights of Karina Torrescano-Hernandez be terminated under RCW 13.34.180 and .190. The mother is not currently safe to be with him. She has engaged in inappropriate punishment, causing physical harm which appears to have occurred on more than one occasion. Without the mother being able to recognize how this particularly extreme last incident could have occurred, it is unlikely that if he was placed with his mother that he would not be hurt again. Furthermore, it is in [C.T.'s] best interest, because he is currently deathly afraid of his mother. He is suffering from adjustment disorder with anxiety. It would be emotionally damaging for him to have contact with the mother at this time. Even with months of reintegration therapy it is dubious that he would ever be able to be with his mother without being seriously or significantly afraid of her or at least in a significant state of anxiety.

Clerk's Papers (CP) at 18. Accordingly, on October 21, 2014, the trial court entered an order terminating Torrescano's parental rights. Torrescano appeals.

## ANALYSIS

### Fifth Amendment Right Against Self-Incrimination

Torrescano argues that during the court-ordered psychological evaluation she was forced to choose between incriminating herself by admitting she burned C.T.'s hands or having her parental rights terminated. She contends this violated her Fifth Amendment

right against compelled self-incrimination and requires reversal of the court's order terminating her parental rights. We conclude that Torrescano's Fifth Amendment privilege was not self-executing here because the trial court's order requiring a psychological evaluation did not compel Torrescano to disclose self-incriminating information.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; see also WASH. CONST. art. I § 9 ("No person shall be compelled in any criminal case to give evidence against himself.").[2] The privilege may be raised in any proceeding, "civil or criminal, formal or informal, where the answers might incriminate [the questioned person] in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973). However, the privilege is generally not self-executing and must be expressly asserted. State v. Jacobsen, 95 Wn. App. 967, 977 P.2d 1250 (1999). But when compulsion is present, the privilege is self-executing, and an individual "does not waive the privilege by failing to invoke it." United States v. McLaughlin, 126 F.3d 130, 135 (3d Cir. 1997). Compulsion exists when a person is threatened with serious penalties if the evidence sought is not produced. In re Dependency of J.R.U.-S., 126 Wn. App. 786, 794, 110 P.3d 773 (2005).[3]

The "penalty" exception is available only if "(1) the person gives answers that would incriminate him or her in a separate criminal proceeding and (2) the State makes

---

[2] "The protection provided by the state provision is coextensive with that provided by the Fifth Amendment." State v. Unga, 165 Wn.2d 95, 100, 196 P.3d 645 (2008).

[3] The parties agree that other circumstances indicating compulsion, such as custodial interrogation, are not relevant here. See Jacobsen, 95 Wn. App. at 973.

express or implied assertions that exercise of the Fifth Amendment privilege will result in the imposition of a penalty . . . ." State v. Post, 118 Wn.2d 596, 610, 826 P.2d 172 (1992). We note that, here, Torrescano never made any incriminating statements. During her psychological evaluation, she denied any wrongdoing whatsoever. She also testified at the termination hearing, where she continued to deny that she burned C.T.'s hands. Torrescano contends that it is irrelevant whether she actually made any incriminating statements, citing Gardner v. Broderick, 392 U.S. 273, 88 S. Ct. 1913, 20 L. Ed. 2d 1082 (1968) and Spevack v. Klein, 385 U.S. 511, 87 S. Ct. 625, 17 L. Ed. 2d 574 (1967) for the proposition that a person need not make self-incriminating statements for the right to be self-executing. See Appellant's Reply Br. at 11. But in both Gardner and Spevack, the petitioners expressly asserted their Fifth Amendment right against self-incrimination and the Supreme Court held they were punished for asserting the privilege. See Gardner, 392 U.S. at 274; Spevack, 385 U.S. 512-13. Where, as here, a person does not invoke the privilege, he or she must show they made incriminating statements. Post, 118 Wn.2d at 610.

Torrescano failed to show any "concrete, imminent threat" of a certain penalty. J.R.U.-S, 126 Wn. App. at 795. In J.R.U.-S., we held that "while termination of parental rights is a consequence of sufficient gravity to qualify as compulsion, the penalty cases have generally required a showing that a penalty would follow directly and more or less automatically from the refusal to answer questions." J.R.U.-S., 126 Wn. App. at 794. We further explained that "there is no compulsion absent a certain and serious penalty, such as an express threat to file a termination petition if the parent invoked the privilege." J.R.U.-S., 126 Wn. App. at 795. We concluded the parents in J.R.U.-S. were

not compelled to respond to questions in a court ordered psychological evaluation because "there was no evidence that a termination petition or any other serious adverse consequence was certain, or even likely, to follow from the parents' refusal to answer questions in the evaluation." J.R.U.-S., 126 Wn. App. at 795.

Here, Torrescano cannot show that failure to respond to questions in her psychological evaluation would "directly and more or less automatically" result in termination of her parental rights. J.R.U.-S, 126 Wn. App. at 794. The parents in J.R.U.-S. were fundamentally dissimilar than Torrescano because no charges had been filed against them and no termination petition had been filed. Here, Torrescano had already been convicted of assault of a child in the third degree and termination proceedings were underway when she voluntarily agreed to undergo a psychological evaluation. While a threat to file a termination petition would have been improper compulsion in J.R.U.-S., Torrescano cannot show any similar compulsion here. Termination was not contingent on her admitting guilt, nor was termination threatened if she refused to answer any questions in her psychological evaluation. She was never expressly required to answer any questions in any way. See In re A.N., 298 Mont. 237, 995 P.2d 427, 435 (2000) (treatment plan required parent to affirmatively explain the cause of a child's injuries and cooperate with law enforcement to resolve the criminal charges gave parent a "Hobson's choice of either successfully completing the requirements of [the] treatment plan, thereby incriminating himself in the criminal proceeding, or refusing to complete the treatment plan, with the substantially certain penalty of having his parental rights terminated"). Because the court did not expressly require Torrescano to either admit guilt or face termination, we conclude she was not

compelled to make self-incriminating statements. Her Fifth Amendment privilege therefore, was not self-executing.

The out-of-state authority Torrescano relies on supports our conclusion. In J.R.U.-S., we cited two Minnesota cases illustrating the difference between requiring a parent to engage in a psychological evaluation and threatening that parent with a penalty if he or she refused to admit guilt. In re Welfare of J.G.W., 433 N.W.2d 885 (Minn. 1989); In re Welfare of J.W., 415 N.W.2d 879 (Minn. 1987). J.W. involved a disposition order in a dependency proceeding that "ordered the parents to obtain psychological evaluations and to explain the death of their 2-year-old nephew, who had been in their care, consistent with the medical findings." J.G.W., 433 N.W.2d at 885. The State's attorney in J.W. expressly stated that if the parents persisted in invoking their Fifth Amendment privilege, the State would file a termination petition. J.W., 415 N.W.2d at 882. The court held that the threat to file a termination petition was an impermissible penalty for invoking the Fifth Amendment privilege and that "the protection afforded by the privilege has been activated." J.W., 415 N.W.2d at 883. The court explained that a trial court could not expressly require the parents to incriminate themselves in therapy. J.W., 415 N.W.2d at 883. But the court nevertheless held that it was constitutionally permissible to require the parents to attend therapy generally, even if that therapy ultimately results in the termination of parental rights because the parents choose to forego incriminating disclosures:

> We hold that the trial court's order, to the extent it requires appellants to incriminate themselves, violates appellants' Fifth Amendment rights and is unenforceable . . . But this is as far as the privilege extends protection. While the state may not compel therapy treatment that would require appellants to incriminate themselves, it may

-11-

require the parents to otherwise undergo treatment. <u>Therapy, however, which does not include incriminating disclosures, may be ineffective; and ineffective therapy may hurt the parents' chances of regaining their children. These consequences lie outside the protective ambit of the Fifth Amendment.</u>

<u>J.W.</u>, 415 N.W.2d at 883 (emphasis added). The Supreme Court of Minnesota repeated this rationale in <u>J.G.W.</u>:

> [In <u>J.W.</u>] we also said that while the state could not directly compel the parents to incriminate themselves as part of the treatment plan, the state could require the parents to undergo treatment successfully and the parents' failure to admit their guilt might as a practical matter make them fail in treatment . . . As we put it, "[T]he risk of losing the children for failure to undergo meaningful therapy is neither a 'threat' nor a 'penalty' imposed by the state" but is "simply a consequence of the reality that it is unsafe for children to be with parents who are abusive and violent."

<u>J.G.W.</u>, 433 N.W.2d at 886 (quoting <u>J.W.</u>, 415 N.W.2d at 884).

Torrescano also relies heavily on <u>In re Interest of Clifford M.</u>, 6 Neb. App. 754 577 N.W.2d 547 (1998). In <u>Clifford</u>, a juvenile court required a parent to enroll in a therapy program "which the court was aware required her to make incriminating statements as a prerequisite to enrollment." <u>Clifford</u>, 577 N.W.2d at 557. The court held that this requirement violated the parent's right against self-incrimination. <u>Clifford</u>, 577 N.W.2d at 554-55. But the court nevertheless agreed with both <u>J.W.</u> and <u>J.G.W</u> that this was different than requiring a parent to engage in meaningful therapy that might involve admitting to past wrongdoing:

> [T]here is a very fine, although very important, distinction between terminating parental rights based specifically upon a refusal to waive protections against self-incrimination and terminating parental rights based upon a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, <u>perhaps in part because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy.</u> The latter is constitutionally permissible; the former is not.

Clifford, 577 N.W.2d at 544 (emphasis added).

Like in J.W. and J.G.W., here, Torrescano was never expressly required to admit guilt. Nor was she ordered to enter a therapy program that required her to make self-incriminating statements prior to enrollment, as in Clifford. Here, the court ordered a psychological evaluation. As a part of that evaluation, Dr. Morgan asked Torrescano to address the methods of discipline she had used with C.T. in the past. As a practical matter, these questions invited Torrescano to disclose self-incriminating information, without which her therapy might be less effective. Even failing to engage in meaningful therapy may ultimately weigh in favor of terminating Torrescano's parental rights. But this consequence falls outside of the Fifth Amendment's protection. See J.G.W., 433 N.W.2d at 886 ("[T]he risk of losing the children for failure to undergo meaningful therapy is neither a 'threat' nor a 'penalty' imposed by the state" but is "simply a consequence of the reality that it is unsafe for children to be with parents who are abusive and violent." (quoting J.W., 415 N.W.2d at 884)). Torrescano failed to show sufficient compulsion triggering a self-executing Fifth Amendment right against self-incrimination.

Ineffective Assistance of Counsel

Next, Torrescano argues that if her Fifth Amendment right against self-incrimination was not self-executing because there was no compulsion, then her counsel was constitutionally ineffective for failing to expressly assert that right. We conclude that her counsel was constitutionally effective. First, allowing Torrescano to provide her version of events by denying any wrongdoing is a reasonable trial strategy.

-13-

Second, even if counsel had asserted Torrescano's Fifth Amendment right, Torrescano cannot show a reasonable probability that the outcome would have been different.

Parents have a constitutional right to appointed counsel in termination proceedings. In re Welfare of J.M., 130 Wn. App. 912, 921, 125 P.3d 245 (2005). To determine whether counsel was ineffective, we apply the same test articulated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See, e.g., In re Dependency of S.M.H., 128 Wn. App. 45, 61, 115 P.3d 990 (2005). "To prevail on a claim of ineffective assistance of counsel, counsel's representation must have been deficient, and the deficient representation must have prejudiced the defendant." State v. Aho, 137 Wn.2d 736, 745, 975 P.2d 512 (1999); Strickland 466 U.S. at 687. "To establish ineffective representation, the defendant must show that counsel's performance fell below an objective standard of reasonableness. To establish prejudice, a defendant must show that but for counsel's performance, the result would have been different." State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002) (citation omitted). Failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim. Strickland, 466 U.S. at 700.

First, Torrescano has failed to overcome the strong presumption that counsel's performance was effective. We are reluctant to find ineffective assistance of counsel except in the most extreme cases. "[S]crutiny of counsel's performance is highly deferential and courts will indulge in a strong presumption of reasonableness." State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). To show deficiency, Torrescano must establish that no legitimate strategic or tactical reasons supported her attorney's choice to not assert her Fifth Amendment privilege. See State v. McFarland, 127 Wn.2d

-14-

322, 336–37, 899 P.2d 1251 (1995). But choosing not to assert this privilege was a legitimate strategy in this case. By answering Dr. Morgan's questions and testifying at the termination trial, Torrescano was able to present her version of events—that C.T. burned his own hands. Throughout the dependency proceedings, the criminal trial, her psychological evaluation, and the termination proceedings, Torrescano maintained that she did not burn C.T.'s hands. It was a reasonable trial strategy to forego her Fifth Amendment privilege and present this testimony so as to discredit C.T.'s testimony and demonstrate that the home environment did not warrant terminating Torrescano's parental rights.[4]

But even if Torrescano could show that her counsel's performance was deficient, she cannot show a reasonable probability that the outcome would have been different had counsel asserted Torrescano's Fifth Amendment privilege. As discussed above, requiring Torrescano to participate in a psychological evaluation did not violate her Fifth Amendment right against self-incrimination. All of the cases supporting that conclusion, discussed above, involve litigants who expressly asserted their Fifth Amendment right against self-incrimination in response to court-ordered therapy. See J.R.U.-S, 126 Wn. App. at 794; J.W., 415 N.W.2d at 883; J.G.W., 433 N.W.2d at 886. Accordingly, even if Torrescano's attorney had asserted her Fifth Amendment privilege in response to the psychological evaluation, the outcome likely would have been the same. Torrescano failed to show prejudice.

---

[4] We note that Torrescano also argues that failure to preserve error for appeal can constitute ineffective assistance of counsel. This is irrelevant because we have addressed the alleged error on the merits above.

-15-

Notice

Torrescano argues the State's failure to provide adequate notice of her parental deficiencies violated due process. She claims the State never gave her prior notice that denying she burned C.T.'s hands could constitute a parental deficiency. We disagree. Torrescano received sufficient notice.

Termination proceedings are accorded strict due process protections. In re Matter of Darrow, 32 Wn. App. 803, 806, 649 P.2d 858 (1982). The due process protections afforded a parent in a termination case include "[n]otice, open testimony, time to prepare and respond to charges, and a meaningful hearing before a competent tribunal in an orderly proceeding." In re Dependency of H.W., 70 Wn. App. 552, 555 n.1, 854 P.2d 1100 (1993) (quoting In re Moseley, 34 Wn. App. 179, 184, 660 P.2d 315 (1983)). "The parents must be clearly advised in adequate time to meet [the termination petition] to prevent surprise, helplessness and disadvantage. Moreover, definite allegations of the purpose of the hearing are necessary to enable the parents to determine intelligently whether to admit or contest the petition." In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970).

The initial dependency petition and the amended dependency petition indicated that Torrescano's inconsistent explanation of C.T.'s wounds was a basis for parental deficiency. The first dependency petition notified Torrescano of her parental deficiencies. The petition provides: "The child, [C.T.] has significant, unexplained burns to the palms of both hands. The mother's explanation regarding the burns is not consistent with the child's injuries." Exhibit (Ex.) 1 at 3. The petition also alleged that C.T. stated his mother burned his hands. It also indicated that Torrescano told law

-16-

enforcement and Child Protective Services that C.T. burned himself. The amended dependency petition stated that medical experts concluded the age of the wounds were not consistent with the mother's explanation of when the wounds occurred and that it was unlikely C.T. would have burned himself. The petition stated that the "burns are clearly inscribed suggesting very rapid, brief contact or contact being held in a fixed position." Ex. 3 at 6. The amended petition also indicated that medical staff observed multiple scars on C.T.'s body and that C.T. stated his mother hit him with various objects. Torrescano also specifically stipulated that she had been charged with assault of a child in the second degree and that any conviction or plea agreement would become part of the basis for dependency. Taken together, the dependency petitions indicate that (1) C.T. suffered burns and other injuries, (2) C.T. said that Torrescano caused these injuries, and (3) Torrescano's statements were inconsistent with C.T.'s statements and the conclusions of medical staff.

The termination petition made similar allegations. It stated that C.T. was removed from Torrescano's custody due to his injuries. It provided that Torrescano's parental deficiencies included "mental health issues, lack of parenting skills and domestic violence." CP at 100. It noted that her conviction for third degree assault of C.T. contributed to these parental deficiencies. The petition specifically alleged domestic violence as one of Torrescano's parental deficiencies and that her conviction for burning C.T.'s hands was related to this deficiency. Denying this incident occurred is obviously relevant to whether "there is a likelihood that conditions will be remedied so that [C.T.] can be returned to" Torrescano. RCW 13.34.180(1)(e). For notice to be sufficient, the allegations must be specific enough to "prevent surprise, helplessness and

-17-

disadvantage." In re Dependency of A.M.M., 182 Wn. App. 776, 791, 332 P.3d 500 (2014) (quoting Martin, 3 Wn. App. at 410). Under these circumstances, Torrescano cannot claim she was surprised, rendered helpless, or disadvantaged. Torrescano received ample prior notice that denying that she burned C.T.'s hands could serve as a basis for finding parental deficiency.

Torrescano's reliance on A.M.M., is misplaced. In that case, we found a trial court's order terminating parental rights failed to provide sufficient notice to the parent when it included a parental deficiency that had not been identified in either the dependency or termination petitions. A.M.M., 182 Wn. App. at 791-93. Specifically, the termination petition alleged that the parent's substance abuse constituted a deficiency, but the trial court ultimately held that the parent's substance abuse in conjunction with her lack of knowledge regarding her children's developmental needs justified termination. A.M.M., 182 Wn. App. at 792. The termination petition did not indicate that ignorance regarding the children's developmental needs would justify termination. A.M.M., 182 Wn. App. at 791-92.

In A.M.M., one of the grounds for terminating parental rights was unrelated to what the State had alleged in its termination petition. Here, however, Torrescano's denial is directly related to deficiencies the State alleged. The State provided sufficient notice that domestic violence was an alleged parental deficiency. The trial court's findings show that Torrescano's denial of any wrongdoing indicated that she may still pose a physical threat to C.T. and therefore termination was justified:

> The mother continues to deny that she abused [C.T.] in any way, and has denied any inappropriate discipline, and denied the need for any services whatsoever . . . [N]ot being able to understand a need for

-18-

treatment even now or acknowledge it at a time where she has already gone through the criminal proceedings renders her a continuing unfit parent. Should [C.T.] be placed with mother now or in the near future, <u>he would be a severe risk of serious physical injury.</u>

CP at 17 (emphasis added). Unlike in <u>A.M.M.</u>, the trial court here did not base its termination ruling on any deficiency unrelated to what was alleged in the dependency or termination petitions. Those petitions specifically alleged domestic violence as a deficiency, and Torrescano's unwillingness to acknowledge a need for treatment regarding that deficiency indicated C.T. might still be in danger of physical harm. As noted above, one relevant factor for termination is whether "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). Torrescano's denial is relevant to this inquiry and she received sufficient notice that it could be relevant to termination.

<u>The State's Offered Services</u>

Torrescano argues that the State failed to meet its burden under RCW 13.34.180(1)(d) by refusing to offer any services tailored to correct her parental deficiencies. The trial court found that any future services would be futile, and that finding is supported by substantial evidence. The record shows that the State met its burden under RCW 13.34.180(1)(d).

RCW 13.34.180(1)(d) that "services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). Torrescano argues the trial court erred when it excused the State from

providing any further services because Torrescano denied burning C.T.'s hands. But the State does not have to provide services where to do so would be futile, or where a parent is unwilling or unable to take advantage of those services. In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988); see also In re Welfare of M.R.H., 145 Wn. App. 10, 25-26, 188 P.3d 510 (2008).

The record supports the trial court's conclusion that additional services would have been futile here. Dr. Morgan testified that additional services would be ineffective. Torrescano stated she required no additional services and was prepared to reunite with C.T. immediately without any additional help. Torrescano continued to deny she burned C.T. Dr. Morgan stated that, during his evaluation, Torrescano denied applying unreasonable discipline. Under these circumstances, substantial evidence supports the trial court's determination that future services would be ineffective.

Even if future services could have corrected Torrescano's parental deficiencies, those services must be capable of correcting the parental deficiencies "within the foreseeable future." RCW 13.34.180(1)(d). Dr. Morgan testified that, even if Torrescano could engage in therapy in good faith, it would take a long period of time to reach a point where she could make significant changes to make sure events like C.T.'s burns "didn't happen again." RP (Aug. 19, 2014) at 16. Dr. Morgan concluded that Torrescano could not be safely reunited with C.T. in the foreseeable future even with treatment. Sarah Cope, C.T.'s social worker, also concluded that Torrescano's deficiencies could not be remedied by additional services in the foreseeable future. Substantial evidence supports the trial court's finding that additional services would not remedy Torrescano's parental deficiencies in the foreseeable future.

Torrescano relies heavily on In re Dependency of T.L.G., 126 Wn. App. 181, 108 P.3d 156 (2005). Torrescano claims that, like the parents in T.L.G., she is willing to participate in additional services and therefore the court erred when it found that additional services would be futile. In T.L.G., we held that the State failed to offer or provide all necessary services in part because "parental deficiencies were not identified, no treatment services were offered, and there [was] no finding [that] they would have been unable to benefit." T.L.G., 126 Wn. App. at 203. Here, by contrast, the State did identify Torrescano's parental deficiencies and provided initial treatment services. Unlike in T.L.G., the trial court here entered a finding that Torrescano was unable to benefit from additional services. As discussed above, substantial evidence supports that finding. The State satisfied the requirements of RCW 13.34.180(1)(d).

### Likelihood Torrescano's Deficiencies Could Be Remedied

Next, Torrescano contends that the State failed to prove that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). For reasons similar to those discussed above, we conclude the State met its burden here.

Torrescano claims that although Dr. Morgan and Sarah Cope testified that additional services would take a long period of time before remedying her parental deficiencies, they did not specify an amount of time. But under RCW 13.34.180(1)(e), whether a parent's deficiencies could be remedied in the near future must be considered from the child's perspective. See In re Welfare of Hall, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983). In a termination proceeding, "what constitutes 'near future'

-21-

depends on the child's age and the placement circumstances." In re Welfare of T.B., 150 Wn. App. 599, 609–610, 209 P.3d 497 (2009).

Here, the State demonstrated that Torrescano's deficiencies could not be remedied in the near future. As discussed above, testimony at trial demonstrated that additional services would be ineffective due to Torrescano's denial of any wrongdoing. C.T.'s placement circumstances support the trial court's conclusion that Torrescano's deficiencies could not be remedied in the near future. C.T. has been living in foster care since September 2012. Testimony at trial from therapists, the GAL, and from C.T. demonstrate that C.T. adjusted well in his foster care placement. He feels happy and safe with his foster parents and wants to be adopted by them. He remains afraid of his mother, and this fear caused anxiety and nightmares throughout Torrescano's criminal proceedings and dependency proceedings. Multiple witnesses testified that C.T. still experiences anxiety because he does not know whether he will be adopted. C.T.'s therapists agreed that achieving permanence was in C.T.'s best interests. Even if treatment would be effective for Torrescano, the record supports the trial court's finding that it would not remedy her deficiencies in the near future, particularly in light of C.T.'s placement circumstances. See, e.g., Hall, 99 Wn.2d at 851 ("'Three months may not be a long time for an adult decisionmaker. For a young child it may be forever.'" (quoting JOSEPH GOLDSTEIN, ANNA FREUD, & ALBERT J. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 43 n.* (1973))). We conclude that the State satisfied RCW 13.34.180(1)(e).

The Best Interests of C.T.

Finally, Torrescano argues that the trial court erred when it concluded that termination of her parental rights was in C.T.'s best interests when the State failed to establish its burden under RCW 13.34.180(1)(d) and (1)(e). Because we conclude that the State satisfied these statutory elements, as discussed above, the trial court did not err when it concluded that termination of Torrescano's parental rights was in C.T.'s best interests.

The primary consideration in termination proceedings is the welfare of the child. In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Once a trial court finds that each element of RCW 13.34.180 has been proven by clear and convincing evidence, it must then decide, by a preponderance of the evidence, that termination is in the best interests of the child. RCW 13.34.190. The trial court has broad discretion in determining the best interests of the child, and its decision is entitled to great deference on review. In re Welfare of Young, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979).

The record supports the trial court's conclusion here. As discussed above, substantial evidence supports the trial court's finding that further treatment would be ineffective for Torrescano. Further, even if that treatment could be effective, it would not remedy her deficiencies in the near future. Given C.T.'s placement circumstances and continuing emotional trauma regarding his mother's actions, the trial court properly concluded that termination of Torrescano's parental rights was in C.T.'s best interests. See, e.g., In re Dependency of T.R., 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) ("a court is 'fully justified' in finding termination in the child's best interests rather than

'leaving [the child] in the limbo of foster care for an indefinite period while [the parent seeks] to rehabilitate himself.'" (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

## CONCLUSION

For the foregoing reasons, we affirm the trial court's order terminating Torrescano's parental rights.

WE CONCUR: